[Civ. No. 17495. Second Dist., Div. One. June 25, 1951.]

CHARLES ACHEN et al., Appellants, v. PEPSI-COLA BOTTLING COMPANY OF LOS ANGELES (a Corporation) et al., Respondents.

Wood, Crump, Rogers & Arndt, Guy Richards Crump and Stanley M. Arndt for Appellants.

James D. Garibaldi, Keesling & Keesling, Henry C. Clausen, O'Melveny & Myers, Rodney K. Potter and Jackson W. Chance for Respondents.

HANSON, J. pro tem.—We are told by appellants that "The issue in this appeal is whether 'Thou Shalt Not Steal' applies to the soft drink distributing business." If that were the only issue we feel we would be compelled to answer it, as appellants would have us do, by stating that the quotation *does apply* to the business mentioned, and, for authority, we would content ourselves with citing the Seventh Commandment. The issue, however, as we see it, while equally as simple as the one stated by appellants, is whether under the terms of written contracts the plaintiffs severally were entitled to recover damages because of defendants' refusal to

renew or extend them. This involves, in large part, a mere matter of the interpretation of the language found therein measured by the trial court's finding upon parol evidence admitted by it.

To aid us in the solution of the problem presented we have literally been bombarded by having the "law books thrown at us." Appellants' opening brief is 183 pages, respondents' brief 190 pages and appellants' reply brief 96 pages. This adds up to 469 pages. In addition we have supplemental briefs from each side along with a supplement entitled "Review of the Facts in the Record" consisting of 111 pages, not to mention the clerk's transcript of 262 pages and a reporter's transcript of 3,941 pages which records the evidence introduced upon the trial which took two months of the trial judge's time. We may add that we are unable to think of any possible so-called equitable considerations which could possibly be raised upon the record, against respondents and the trial judge, which have not been urged by appellants. Under the circumstances we think that any reader of this opinion will concede that we cannot be expected to answer all the arguments of appellants set forth under 28 chapter headings or discuss or differentiate the 156 cases cited by appellants and in large part argued, or the reference to 17 texts and 16 statutes. We really think that our opinion, at least, should have some terminal facilities. Moreover, we feel that there is real merit in the rules of several of the various United States Courts of Appeals which require the clerk to refuse to file an appellant's or respondent's opening brief which exceeds 50 pages and a reply brief which exceeds 20 pages unless it is accompanied by an order from the court permitting its filing. (See rule 19 of the U.S.C.A. [second circuit].)

Turning to the case at hand we find that the controversy herein stems from the claim of the appellants that their contracts as distributors of Pepsi-Cola were, by a course of conduct on the part of respondent, automatically renewed or extended at least for a year or more from July 18, 1946. The trial court held otherwise. As a consequence appellants charge that the trial court erred (1) in holding the contracts were not uncertain and ambiguous (2) in striking out certain parol evidence which had been received (3) in interpreting the language of the contracts to mean that appellants' contracts ceased on July 17, 1946 and (4) in making certain findings and in failing to make other findings.

Against this preliminary background we proceed to set forth the essential facts. The Pepsi-Cola Company (hereinafter referred to as the "national corporation"), for years has been engaged in manufacturing what is known as "Pepsi-Cola Concentrate" which it sells to bottlers licensed by it in the various states, for use as a base in concocting the beverage known as Pepsi-Cola. In 1936 certain members of the Guth family who were stockholders and officers in the national corporation organized, with its assistance, a concern known as Pepsi-Cola Company of California. In July, 1939, the members of the Guth family organized the respondent corporation the "Pepsi-Cola Bottling Company of Los Angeles" to which the original California company transferred its assets. Respondent's license from the national corporation authorized it to bottle and distribute the beverage Pepsi-Cola exclusively in several counties in the southern California area.

The respondent corporation, it seems, concluded to market the beverage it bottled through distributors selected by it, who were to be given the exclusive right to distribute the bottled beverage in the areas allotted or granted to them. To that end it caused its counsel to prepare a uniform type of printed contract. Except for blanks left for insertion of the date of execution, the name of the distributor, the description of the territory granted, the *number* of days of notice left blank in paragraph 13, the effective date of the contract left blank in paragraph 14, and the blank lines for signatures, the contract otherwise was wholly printed. All distributors, whether selected in 1939 or later were required to sign this form of contract. All the distributors who had oral contracts with respondent's predecessor were offered, accepted and signed these printed forms of contract in July, 1939, with the blanks filled in. Fourteen (14) of the nineteen (19) distributors who are appellants here signed these forms of contract as early as July, 1939.

The contract typical of all the 1939 contracts here involved (which we shall hereafter refer to as "the 1939 contract") provides as follows: (1) ". . . appoints the distributor its [respondent's] exclusive agent to distribute Pepsi-Cola in" [describing the specific territory]. (2) An agreement by the distributor that he will purchase at the current wholesale price the number of cases of Pepsi-Cola the respondent may set at the beginning of each calendar month; the company however covenanting that the number shall be reasonable taking into account certain factors named. (3) That the distributor shall

operate as an independent contractor and not as an employee. (4) "It is understood and agreed that the distributor may adopt such arrangements as he desires with regard to the details of distributing the company's product, the personnel of his workers, and the hours during which said work is performed, and said distributor shall be responsible to the company only for the purchase of its product as hereinabove set forth. It is further mutually understood that the distributor's activity shall not be subject to the control, active or implied, of the Company, and said distributor shall not be subject to discharge by the Company." (5)-(6) That distributor shall be in business for himself, shall own and service his own trucks; that he shall not be required to dress in any particular style. (8)-(9) Not here material. (10)-(11) permit assignments and transfers of the contract provided the company consents and the assignee assumes in writing the duties and obligations of the contract. (12) Not here material. (13) "Either party shall have the right to terminate this contract upon five days notice, and all rights of the parties hereunder, upon the termination of said contract, shall cease and be of no force or effect . . ." (14) "This contract shall become effective on the *18th day of July, 1939*, and shall remain in full force and effect for a period of one (1) year from and after said date, unless the same is terminated as hereinbefore provided, by either of the parties hereto prior to said expiration date." (15) "The company hereby grants to the distributor a right and option to renew this contract for a period of one (1) year from the date of its expiration. In the event the distributor shall decide to exercise said right and option, he shall notify the company in writing of said desire and intention to renew said contract at least ten (10) days prior to the expiration date of this contract."

All the distributors exercised in July, 1940, the option to extend their contracts to July 17, 1941. In July, 1941, prior to the latter date respondent prepared a letter contract duly signed by it dated July 18, 1941, which it sent to all its distributors. A typical copy sent to the distributor reads as follows:

"Dear Sirs:

"We have heretofore appointed you a distributor of Pepsi-Cola and Mavis products. Said agreement was to endure for a period of one year and contained an option which was subsequently exercised extending said contract for an additional

year to July 17, 1941. We hereby agree to an extension of said contract upon the same terms and conditions as therein set forth for an additional year to and including July 17, 1942.

"Very truly yours,

Pepsi-Cola Bottling Company
of Los Angeles

By Charles G. Guth, Jr.

President

the foregoing is hereby accepted:

Bopp & Ballard

By F. A. Bopp
    Distributor''

Each distributor signed and returned to respondent the letter contract. In July of each year thereafter up to and including July, 1945, the respondent corporation sent similar, if not identical, letter contracts to its distributors who in each case signed and returned them.

In 1946 control of the corporation passed to a new group of stockholders and, on or prior to July 5, 1946, a new board of directors and new officers were elected. At the meeting of the board on July 5, 1946, the directors voted to terminate the prevailing method of distributing Pepsi-Cola through distributors and directed that none of its outstanding contracts should be renewed. The distributors under date of July 9, 1946 (earlier in one instance) were notified by letter that the respondent corporation would not continue them as distributors on or after July 17, 1946.

None of the distributors were originally required to or ever paid respondent any consideration for the contracts which gave them the exclusive right to sell and distribute Pepsi-Cola in the territory described in their respective contracts. The net profits of each distributor varied considerably, but apparently never netted any distributor, except one, more than $3,500 in any one year in any one territory. A few of the distributors bought or sold their contract rights for sums varying from $3,000 to as high as $7,000 at times with or without equipment, such as trucks. Often these sales were referred to by the distributors and by the corporation as a sale of "routes."

The action below purportedly was one for declaratory relief so far as the defendant Pepsi-Cola was concerned. While the complaint (34 pages in length) sought a declaration of the rights and obligations of the distributors as against Pepsi-Cola

it sought in addition exceedingly large actual and exemplary damages, an injunction, and other equitable relief based on an alleged breach of contract, false representation and other alleged causes of action. Additionally, the complaint charged as to other named defendants a violation of the Sherman Anti-trust Act and the Cartwright Act.

So far as we have been able to ascertain, the trial judge was not furnished at the beginning of the trial or prior thereto with any trial brief to aid him. Moreover, it does not appear from the opening statements or otherwise that he was informed that the major question which he would be called upon to rule would be the applicability of the parol evidence rule. In fact, the case was made even more difficult for him by reason of the manner and order of its presentation. At the conclusion of the opening statements some of the defendants, other than Pepsi-Cola made certain motions, and arguments thereon, touching upon their liabilities. As soon as these were disposed of the plaintiffs began their case by offering for identification or in evidence document after document. This continued for the better part of two days without objection. It was not until the very close of the second day of the trial, when the plaintiffs began reading a deposition, that there was brought to the fore the question of the admissibility of parol evidence which it was contended violated the parol evidence rule. After listening to detailed arguments and the citation of, and a reading from the authorities, which did not mention a most pertinent and controlling case which has been cited to us, and, which if cited would probably have caused the trial judge to rule otherwise, he concluded he would permit the plaintiffs to offer whatever evidence they chose as to the ''surrounding circumstances,'' including therein all representations and so-called admissions of the respondent or its agents, with the announcement that at the close of the case he would strike out such evidence as he felt violated the rule. As a consequence of this ruling the case was necessarily lengthened with the result it took two months for its trial. Viewed by us in retrospect with the aid of decisions not submitted to the trial judge, the ruling was distinctly erroneous and unduly lengthened the trial, but even so we are not prepared to say we would necessarily have ruled otherwise had we been in the position in which the trial judge found himself. We turn to discuss the errors which appellants say he made.

The trial judge as we understand his ruling struck out only the parol evidence offered by appellants which (1) embodied

representations made by the agents of appellants at and prior to the signing of the 1939 contract or the subsequent letter contracts, as to meaning of the language used in those contracts as to paragraphs 13, 14 and 15 and (2) the like representations made after the execution of the contracts except on the issue tendered by plaintiffs as to waiver and estoppel. All other evidence produced by appellants, regardless of whether it did or did not violate the parol evidence rule was permitted to remain in the record. We come then to the single question whether the ruling excluding the evidence mentioned was or was not erroneous.

The case of appellants is based wholly upon the 1939 written contracts, modified as they would have the language thereof modified by their testimony as to what they intended by and understood the language to mean, augmented by representations of like tenor made by respondent, and supplemented by the meaning ascribed by appellants to the language of the subsequent letter contracts.

The 1939 contract provides that it is to endure for one year only (paragraph 14) unless the distributor exercises an option given to him to renew it for a year (paragraph 15). The contract gives to Pepsi-Cola no like right to renew the contract. However, the contract (paragraph 13) gives to both parties the right on five days' notice to terminate the contract. (In distributor Gray's contract the provision is for 30 days' notice.) The language of these provisions is exceedingly plain and requires no extrinsic aid to interpret them. As has aptly been said in 3 Williston on Contracts, rev. ed. (1936), section 618, page 1777: "The common or normal meaning of language will be given to the words of a contract unless the circumstances show that in a particular case a special meaning should be attached to it." When we come to reading the language of paragraph 4 of the 1939 contract we find a phrase reading "and said distributor shall not be subject to discharge by the Company." Is this language in the collocation of the other language used in said paragraph, so ambiguous and uncertain as to require extrinsic evidence to aid the court in interpreting it? If we were called upon to state the meaning or sense of the phrase by confining ourselves to the four corners of the contract, we would say it has to do only with the manner and exercise by the distributor of his own activities, as an independent contractor and not an employee, in selling and distributing Pepsi-Cola, but that it does not affect in any manner the language of paragraph 13 or for that matter paragraphs

14 and 15. However, the trial court received, and did not strike out, evidence submitted by the parties bearing on the intent, meaning and sense of the phrase. Upon evidence which was contradictory it found that the phrase did not give the distributor an indefinite term or a right to continue indefinitely as a distributor. On the contrary, it found that the provisions for the duration and termination of the 1939 contract were set forth in paragraphs 13, 14 and 15, and that on and after July 17, 1941, paragraph 15 thereof was not by reference or otherwise a part of the subsequent letter contracts. In so ruling it was in accord with *Penilla* v. *Gerstenkorn*, 86 Cal.App. 668 [261 P. 488], where it is said: " 'A general covenant to extend or renew implies an additional term equal to the first, and upon the same terms, including that of rent, *except the covenant to renew*; to include which would make the lease perpetual.' "

The position of the appellants, however, is that paragraph 4 was uncertain and ambiguous and hence contradicted paragraphs 13, 14 and 15 and, under those circumstances, they were entitled to introduce parol evidence not only as to the meaning, intent and sense of the quoted phrase in paragraph 4, as they were permitted to do, but as to *all* the terms of the contract. The law is otherwise. ▋ If all the terms of a contract are plain, but one, then we seek evidence of a limited character to ascertain the sense in which the parties used the term. Thereupon, having ascertained the meaning or sense of the phrase or term, we read the contract, as a whole, to determine whether any of the terms are then contradictory. If they are not we proceed no further. (*Cf.* the oft-quoted language of Lord Wensleydale, in *Grey* v. *Pearson*, 6 H.L.C. 61, quoted in 3 Williston on Contracts, rev. ed. (1936), section 618, page 1777, reading as follows: "The grammatical and ordinary sense of the words is to be adhered to, unless that would lead to some absurdity, or some repugnance or inconsistency with the rest of the instrument, in which case the grammatical and ordinary sense of the words may be modified so as to avoid that absurdity and inconsistency, but no further." (See, also, Rest., Contracts, § 235(a).)

In an endeavor to support their contention that once an ambiguity is shown in a contract "the bars are down," as appellants phrase it, to introduce parol evidence on all the terms of the contract, they quote time and again a very famous observation of Mr. Justice Holmes in *Towne* v. *Eisner*, 245

U.S. 418 [38 S.Ct. 158, 62 L.Ed. 372]. It reads as follows: "A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." The question before Justice Holmes was whether the word "income" as used in the Constitution and as used in the income tax law meant one and the same thing.

That Mr. Justice Holmes did not mean to imply in the language he used that every word in a contract should or could be defined by the "surrounding circumstances" is clear from a reading of his article entitled, "The Theory of Legal Interpretation," equally as famous as is the quotation. In that article in which he expressly concurs with the language used by Lord Wensleydale, quoted above, he says in part: "How is it when you admit evidence of circumstances and read the document in the light of them? . . . we ask, not what this man meant, but what those words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used, and it is to the end of answering this last question that we let in evidence as to what the circumstances were . . .

. . . . . . . . . . . . . .

". . . Of course, the purpose of written instruments is to express some intention or state of mind of those who write them, and it is desirable to make that purpose effectual, so far as may be, if instruments are to be used. The question is how far the law ought to go in aid of the writers. In the case of contracts, to begin with them, it is obvious that they express *the wishes not of one person but of two, and those two adversaries.* If it turns out that one meant one thing and the other another, speaking generally, the only choice possible for the legislator is either to hold both parties to the judge's interpretation of the words in the sense which I have explained, or to allow the contract to be avoided because there has been no meeting of minds. The latter course not only would greatly enhance the difficulty of enforcing contracts against losing parties, but would run against a plain principle of justice. For each party to a contract has notice that the other will understand his words according to the usage of the normal speaker of English under the circumstances, and therefore cannot complain if his words are taken in that sense.

. . . . . . . . . . . . . .

". . . I do not suppose that you could prove, for purposes of construction as distinguished from avoidance, an oral dec-

laration or even an agreement that words in a dispositive instrument making sense as they stand should have a different meaning from the common one; for instance, that the parties to a contract orally agreed that when they wrote five hundred feet it should mean one hundred inches, or that Bunker Hill Monument should signify Old South Church.'' (Italics supplied.) (12 Harv.L.Rev. 417.) See, also, IX Wigmore on Evidence, 3d edition (1940), section 2462, page 191.

Appellants further contend that even if the parol evidence rule was properly invoked by the trial court they were entitled to show certain statements made by the officers of respondent, at and prior to the execution of the contracts, i. e., the 1939 contract or the letter contracts as they were in the nature of admissions against interest. Appellants particularly point to the testimony of some of the distributors who testified that the officers of the company interpreted the language of the contracts to mean, as for instance, that the term of the contract was for an indefinite period and could not be cancelled. ▓ The short answer to the contention is that the exception to the hearsay rule which permits declarations or admissions by a party to be shown applies only to declarations or admissions of *fact* and not to the interpretation, legal or otherwise of the facts. ▓ Here the factual language set forth in the contracts was not only equally available, but known to the respective parties. What the language used in the contracts meant was a matter of interpretation for the courts and not controlled in any sense by what either of the parties intended or thought its meaning to be if it ran contrary to the court's interpretation of it. The views expressed by any party to the contracts were, at best, his opinion or conclusion and as such not admissible, under any exception to the hearsay rule or otherwise.

In *Tritsch* v. *Ayer Canning Co.*, 316 Mass. 598 [56 N.E.2d 11], the court had before it various letters and telegrams offered to show a contract between the parties. The court said: ''The admission by Burns in his testimony that the correspondence constituted the entire contract does not help the plaintiff. It is still a question of law what was the contract and what is its meaning.'' So in *Sturm* v. *Boker*, 150 U.S. 312, at p. 336 [14 S.Ct. 99, 37 L.Ed. 1093], it is said: ''Both the defendants and the insurance companies had the written contracts before them, and were presumed, as a matter of law, to know their legal effect and operation. What the complainant said in his testimony was a statement of opinion upon a

question of law, where the facts were equally well known to both parties. Such statements of opinion do not operate as an estoppel. If he had said, in express terms, that by that contract he was responsible for the loss, it would have been, under the circumstances, only the expression of an opinion as to the law of the contract, and not a declaration or admission of a fact, such as would estop him from subsequently taking a different position as to the true interpretation of the written instrument.''

Notwithstanding what we have so far said we are told that our Supreme Court in *Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751 [128 P.2d 665], announced not *one* but *nine* separate *holdings*, which are quoted to us in detail. The truth of the matter is that the court did not announce a solitary one of the nine as its holding, i. e., the *ratio decidendi* of the case. In any case, ''The principle of the case is found by taking account .(a) of the facts treated by the judge as material, and (b) his decision as based on them.'' (Goodhart, *Determining the Ratio Decidendi of a Case*, 40 Yale L.J. 161.) The principle of a case is not found in the reasons given in the opinion or in the law therein set forth. In short, the *ratio decidendi* of the Universal case is simply that the contract was ambiguous on its face and hence that parol evidence was admissible for the purpose of arriving at the meaning and sense of the contract.

In *Nelson* v. *Abraham*, 29 Cal.2d 745 [177 P.2d 931], cited by appellants, the court held that the parties had entered into a joint venture agreement by the terms of which the plaintiff was entitled to receive a stated salary and a stated portion of the net profits of the San Francisco operation, i. e., a branch ice business. It further held that under the facts of the case upon a sale of the business by the defendant the plaintiff was entitled to his percentage of the net profit arising from the sale. The lower court, having held otherwise, was reversed. The case is not in point. The numerous quotations made of language from the opinion are arguments used by the court in arriving at its decision and are in no sense words of precedent. In the Nelson case a fiduciary relation was shown which is not here involved. Likewise *Hollywood M. P. Equipment Co.* v. *Furer*, 16 Cal.2d 184 [105 P.2d 299], is not in point. The quotations from that opinion, so often quoted, in appellants' briefs are but argumentative observations and no part of the *ratio decidendi* of the case.

The nine so-called ''holdings'' in the Universal case are

either but recitals by the court of rules governing the admissibility of evidence, where the court finds the terms of the contract uncertain or ambiguous, or else arguments or observations used by the court in reaching its decision. As was said by Chief Justice Marshall 130 years ago in *Cohens* v. *Virginia*, 6 Wheat. (U.S.) 264 [5 L.Ed. 257, p. 290] : ''The counsel for the defendant in error urge; in opposition to this rule of construction, some *dicta* of the court, in the case of *Marbury* v. *Madison* [1 Cranch (U.S.) 137 (2 L.Ed. 60)].

''It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

''In the case of *Marbury* v. *Madison,* the single question before the court, so far as that case can be applied to this, was, whether the legislature could give this court original jurisdiction in a case in which the constitution had clearly not given it, and in which no doubt respecting the construction of the article could possibly be raised. The court decided, and we think very properly, that the legislature could not give original jurisdiction in such a case. But, in the reasoning of the court in support of this decision, some expressions are used which go far beyond it.''

We sit as a court to review errors of law and not errors of fact. Accordingly, we are perplexed to understand just why appellants throughout their briefs and argument constantly refer to the fact that the trial judge should on the evidence presented to him have found the facts contrary to the findings he made. If we were to conclude he erred in every finding he made on contradictory evidence we would still be completely helpless to reverse him on that account. The rule is too well established to require the citation of precedents.

Under somewhat lurid chapter headings such as ''Blood, Sweat and Tears'' and ''D-Day Comes'' we are told with unction the damages appellants suffered. But damages, be they ever so large, can have no effect on the basic issue in this case as to whether there was in fact a breach of contract.

The contention that the court erred in making certain findings and in failing to make other findings is without merit. We have reviewed them at length and fail to find any reversible error. Other errors assigned are likewise in the same category.

The judgment is affirmed.

White, P. J., and Drapeau, J., concurred.

A petition for a rehearing was denied July 23, 1951, and appellants' petition for a hearing by the Supreme Court was denied August 23, 1951.  Carter, J., voted for a hearing.