[Civ. No. 32697. First Dist., Div. One. Apr. 30, 1975.]

RICHMOND RAMBLERS MOTORCYCLE CLUB,
Plaintiff and Appellant, v.
WESTERN TITLE GUARANTY COMPANY-
CONTRA COSTA DIVISION et al., Defendants and Respondents;
ATCHISON, TOPEKA AND SANTA FE RAILWAY
COMPANY et al., Interveners and Appellants.

748

**COUNSEL**

Pelletreau, Gowen, Moses, Porlier & Larson and Thomas G. Shelby for Plaintiff and Appellant.

Bricker, Evatt, Barton & Eckler as Amici Curiae on behalf of Plaintiff and Appellant.

John J. Balluff, Robert B. Curtiss, Thomas I. McKnew, Jr., Cox, Cummins & Lamphere and Charles L. Hemmings for Interveners and Appellants.

Joseph Landisman and Richard Leon Marcus for Defendants and Respondents.

James P. O'Drain, City Attorney (Richmond), as Amicus Curiae on behalf of Defendants and Respondents and Interveners and Appellants.

**OPINION**

**ELKINGTON, J.**—In the action below, plaintiff the Richmond Ramblers Motorcycle Club (hereafter sometimes the "Club") sought a judicial declaration (with incidental relief), (1) that it had *"acquired a prescriptive easement"* (italics ours) in, and (2) that there had been an *"implied dedication to public use"* (italics ours) of, some 77 acres of unimproved inland real property (hereafter the "land") in the City of Richmond. The land, valued at approximately $800,000, was owned in varying amounts by the defendant Western Title Guaranty Company and the interveners the Atchison, Topeka and Santa Fe Railway Company and Santa Fe Land Improvement Company (hereafter collectively, and for convenience, "defendants").

Judgment on the two issues posed by the complaint was entered in favor of the defendants. The Club has appealed from that portion of the judgment.

On its appeal, the Club contends that, *as a matter of law,* the evidence and the trial court's findings of fact mandated judgment in its favor on each of the issues.

We point out such of the trial court's findings of fact as are found relevant to the question immediately before us.

"9. As early as 1942, and continuing thereafter to the present time, motorcyclists have frequently ridden [the land]. In 1947 the Richmond Ramblers were incorporated, and constructed and occupied its clubhouse [on property adjoining the land]. During ensuing years, motorcycle use on the [land] increased, especially commencing about 1962. The Richmond Ramblers periodically sponsor American Motorcycle Association sanctioned motorcycle events on [the land] which attract large crowds of spectators numbering between 2,000 to 5,000, with up to 300 riders. Spectators were asked to pay $2.00 as a 'contribution' to the Ramblers, but were not prohibited from attendance if they declined to pay. Loud speakers were provided to announce events and the Ramblers also arranged for stand-by ambulance, off-duty police, the installation of temporary chemical toilet facilities, trophies, beer and food concessions. Additionally to the sanctioned events, the Ramblers held frequent inter-club races, always on a Sunday, with occasional night events. On weekdays, Saturdays and Sundays where no regular events were scheduled, the three (3) parcels were used by members of the [Club] and by motorcycling members of the general public.

"[The land] contains a flat area which has been used over the years by members of the general public as a circular 'flat track' for motorcycles, mini-bikes, bicycles, and four wheel vehicles, and also as an area for the flying of model airplanes. . . .

"Over the years random and sporadic use was made of all parcels by unidentified members of the general public for such recreational purposes as horseback riding, kite flying, bicycle riding, picnicking and hiking. For the most part, however, the use of [the greater part of the land] was connected with motorcycle riding.

"10. None of the [land was] maintained by the city, nor did the city prohibit or discourage the use mentioned of the parcels until 1970, when Penal Code § 602(m) was adopted, when the Richmond Police Department commenced a program of enforcing trespassing laws as they applied to motorcycle users of the parcels in question. . . . The Ramblers provide medical insurance for riders and spectators, but no liability insurance. . . .

"14. The defendants and intervenors purchased and owned the land and paid substantial taxes thereon with the intention of ultimate future development or resale; the defendants and intervenors knew or should have known of the use of the various parcels by members of [the Club] and members of the general public; the defendants and intervenors took no appreciable steps to prevent such use of their property aside from the posting of several no trespassing signs, until the past several years, because they were unaware that inaction on their part might result in a claim of forfeiture on a theory of public dedication, . . . No affirmative action was ever taken by defendants or intervenors which would mislead the Ramblers or the general public that the area in question was public property. The [Club] has not paid any real property taxes levied or assessed against the lands of defendants and intervenors. The motorcycle use made of the lands is of limited value as compared with the potential economic usefulness of the area. . . .

"15. Were public dedication be held to have occurred for use of the area by motorcycles, no feasible further use could be made of the property by its owners. . . . Dedication to the public of the land would leave no entity clothed with authority to regulate use of the land by motorcyclists, for their own protection or protection .of the general public."

We find the foregoing portions of the trial court's findings of fact to be supported by substantial evidence. The Club has made no contention to the contrary.

Other of the trial court's findings of fact are contended by the Club to be unsupported by the evidence. They follow:

"The [Club] and the public used the land when and how they pleased, but at no time did they believe the land to be public property, nor that they had a legal right to use same, nor that they had a vested right or interest in perpetuity therein."

"[N]either the members of the [Club] nor of the public believed the land to be public property nor that they had legal right to use same, nor that the public had a vested right or interest in perpetuity therein, and the subject state of mind of defendant and intervenors was that the Ramblers and the public were to be permitted use of the property until the lands were sold or developed."

"The use of the land by the Ramblers and by members of the public has not been hostile nor adverse to the rights of the defendant and intervenors, nor under any claim of right."[1]

We and the parties are here bound by the substantial evidence rule: "This principle holds that when a court's finding or a jury's verdict is attacked on the ground that it is not sustained by the evidence, the power of an appellate court begins and ends with the determination whether there is any substantial evidence, contradicted or uncontradicted, which will support the verdict. Questions of credibility must be resolved in favor of the factfinder's determination, and when two or more inferences can reasonably be drawn from the evidence, a reviewing court may not substitute its deductions for those of the trier of fact. If on any material point the evidence is in conflict, it must be assumed that the court or jury resolved the conflict in favor of the prevailing party." (*Abar* v. *Rogers,* 23 Cal.App.3d 506, 510 [100 Cal.Rptr. 344]; and see *Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.,* 66 Cal.2d 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805].)

Evidence supporting the questioned findings of fact follows.

The manager and one of the owners of a parcel of the land testified that the Club had "consent" to use the parcel until 1970 when property owners in the vicinity commenced complaining about the "noise problem." The president, who was also a 12-year member, of the Club conceded that he had always considered the defendant land owners as "good neighbors to the Richmond Ramblers Motorcycle Club." This relationship continued until 1970. Yet another Club member, officially representing that body before the City of Richmond Council, had stated: "That the riders represented a cross section of all walks of life and all age brackets and that deprivation of their recreation would be discriminatory, that the land owners on whose property they had been riding had been fully aware of their activities for many years and had not made an issue of their use of the hills for their riding trails, that a majority were from the Richmond area, *that the club was fully cognizant of the fact their activities could not continue there unmolested in perpetuity, and the members were working with the Regional Park District and other clubs in*

---

[1]Although a portion of this grouping of the findings of fact is found under the heading "Conclusions of Law," we treat it as additional findings of the trial court. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 323, pp. 3126-3128.)

*an attempt to find a suitable location that would accommodate all of their various activities.* " (Italics added.)

Also of significance is the fact that throughout the period at issue, defendants or their predecessors paid all taxes on the land, and that the uses claimed by the Club for itself and the public would, in effect, deny defendants any beneficial use thereof. Although such payment of taxes, *of itself,* has been held "not sufficient to rebut" dedication of a city street (see *Venice* v. *Short Line Beach Land Co.,* 180 Cal.447, 450 [181 P. 658]), an inference may reasonably be drawn therefrom that defendants had no "unequivocal" or other intention to dedicate the land to the public's or the Club's use.

The foregoing, with the evidence supporting the uncontradicted findings of fact we have set out above, constitutes substantial evidence that the Club's and the public's use of the land was permissive and by way of license, and neither "hostile nor adverse to the rights of [defendants] nor under any claim of right."

We look now to the law.

It has consistently been held that a *prescriptive right* to land will not be acquired through its use by license of the owner, or by his permission, express or implied. (*Clarke* v. *Clarke,* 133 Cal. 667, 670-671 [66 P. 10]; *Franz* v. *Mendonca,* 131 Cal. 205, 208-209 [63 P. 361]; *Case* v. *Uridge,* 180 Cal.App.2d 1, 8 [4 Cal.Rptr. 85]; *Kaler* v. *Brown,* 101 Cal.App.2d 716, 720 [226 P.2d 66]; *Carroll* v. *Agliano,* 80 Cal.App.2d 46, 47 [180 P.2d 747]; *Jones* v. *Tierney-Sinclair,* 71 Cal.App.2d 366, 369 [162 P.2d 669]; *Matthiessen* v. *Grand,* 92 Cal.App. 504, 509 [268 P. 675]; *Irvin* v. *Petitfils,* 44 Cal.App.2d 496, 502 [112 P.2d 688]; *Nay* v. *Bernard,* 40 Cal.App. 364, 366 [180 P. 827].) As said in *Kaler* v. *Brown, supra* (p. 720): " 'Prescriptive rights are established only when the enjoyment thereof is adverse, continuous and under claim of legal right, and not by consent, permission or mere indulgence of the owner of the alleged servient estate.' "

A similar rule holds that neither will *public dedication* of land be implied where the public use is under a license or permission of the owner. For such a dedication the use must be " 'adverse and under a claim of legal right.' " (*O'Banion* v. *Borba,* 32 Cal.2d 145, 150 [195 P.2d

10]; see also *Union Transp. Co.* v. *Sacramento County,* 42 Cal.2d 235, 241 [267 P.2d 10]; *Diamond Match Co.* v. *Savercool,* 218 Cal. 665, 669 [24 P.2d 783]; *Morse* v. *Miller,* 128 Cal.App.2d 237, 245 [275 P.2d 545].) And although dedication may sometimes be inferred, "there must [nevertheless] be an unequivocal intention to dedicate property to a public use." (*Greyhound Lines, Inc.* v. *Public Utilities Com.,* 68 Cal.2d 406, 413-414 [67 Cal.Rptr. 97, 438 P.2d 801]; see also *Union Transp. Co.* v. *Sacramento County, supra,* p. 240; *Manhattan Beach* v. *Cortelyou,* 10 Cal.2d 653, 660 [76 P.2d 483]; *Faus* v. *County of Los Angeles,* 256 Cal.App.2d 604, 610 [64 Cal.Rptr. 181].)

It is, of course, a question of fact for the trial court or jury, to be determined from all of the circumstances of the case, whether one's use of another's property is adverse, or with the permission or license of the owner. (*O'Banion* v. *Borba, supra,* 32 Cal.2d 145, 149; *Morse* v. *Miller, supra,* 128 Cal.App.2d 237, 245.) And, as indicated, on appeal the "issue is merely whether there is sufficient evidence to support the judgment of the trial court." (*O'Banion* v. *Borba, supra,* p. 150.)

██ Under the facts as found by the trial court, and under well-established law, the trial court could reasonably conclude, as it did, that the Club's and the public's use of defendants' land was neither adverse, nor prescriptive, nor attended by an implied dedication, but was instead with the *permission,* or *license* of the defendants.

Accordingly, no error is seen in the adjudication that the Club had not acquired a prescriptive easement in, and that there had been no implied dedication to public use of, the subject land.

██ The Club rests its case exclusively on the widely discussed, and sometimes criticized, case of *Gion* v. *City of Santa Cruz,* 2 Cal.3d 29 [84 Cal.Rptr. 162, 465 P.2d 50].[2]

[2]See: 3 Witkin, Summary of California Law (8th ed. 1973) Real Property, sections 80, 81, pages 1834-1837; Lascher, *A Doctrine Dawns in Environmental Law* (1971) 46 State Bar J. 16; Shavelson, *Gion v. City of Santa Cruz: Where Do We Go From Here?* (1972) 47 State Bar J. 415; etc.; Note (1971) 59 Cal. L.Rev. 231; Note (1970) 22 Stan. L.Rev. 575; Note (1971) 44 So.Cal. L.Rev. 1092; Comment (1971) 18 U.C.L.A. L. Rev. 795; Comment (1971) 11 Santa Clara Law. 327; Note (1970) 7 Cal.Western L. Rev. 259; Berger, *Nice Guys Finish Last—At Least They Lose Their Property: Gion v. City of Santa Cruz* (1971) 8 Cal.Western L.Rev. 75; Gallagher, Jure & Agnew, *Implied Dedication: The Imaginary Waves of Gion-Dietz* (1973) 5 Sw. U. L.Rev. 48; and see: Civil Code, sections 1009 (enacted 1971) and 813 (as amended 1971), responsive to *Gion* but operating prospectively only (*cf.* 3 Witkin, *op.cit.,* § 81, pp. 1836-1837).

*Gion,* and its contemporaneously decided companion case of *Dietz* v. *King* (of the same citation), concerned roads or rights of way, long used by the public, to ocean beaches. *Dietz* additionally concerned the beach at the end of the road, which had been used continually by the public for more than 100 years.

In each case the court found, as a matter of law, that there had been an implied dedication to public use of the property rights at issue. In doing so the court expressed itself in the following manner:

"When . . . a litigant seeks to prove dedication by adverse use, the inquiry shifts from the intent and activities of the owner to those of the public. The question then is whether the public has used the land 'for a period of more than five years with full knowledge of the owner, without asking or receiving permission to do so and without objection being made by anyone.' " (*Gion,* p. 38.)

"[The] public use may not be 'adverse' to the interests of the owner in the sense that the word is used in adverse possession cases. If a trial court finds that the public has used land without objection or interference for more than five years, it need not make a separate finding of 'adversity' to support a decision of implied dedication." (*Gion,* p. 39.)

"If the owner has not attempted to halt public use in any significant way, however, it will be held *as a matter of law* that he intended to dedicate the property or an easement therein to the public, and evidence that the public used the property for the prescriptive period is sufficient to establish dedication." (Italics added; *Gion,* p. 41.)

It will be seen that the language of *Gion,* which has been termed "innovative" by Mr. Witkin (3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, § 80, p. 1834), seems to be at odds with the long lines of authority we have adverted to above. But a closer examination of the rule and rationale of *Gion,* in our opinion, causes the inconsistency to vanish.

The *Gion* court (p. 39) at the outset of its discussion posed the question whether there is "any difference between dedication of shoreline property and other property?" It found a "strong policy . . . of encouraging public use of shoreline recreational areas." (*Gion,* p. 42.)

Advertance was made to statutes and judicial decisions creating "a presumption in favor of public ownership of land between high and low tide," and to the state's Constitution, article XV, section 2, "clearly" enunciating the public policy "in favor of allowing the public access to shoreline areas." (*Gion*, p. 42.) And it pointed out: "Other legislative enactments that indicate the strong public policy in favor of according public access to the coast include (1) article I, section 25 of the California Constitution (guaranteeing the right to fish); (2) Government Code sections 54090-54093 (relating to discrimination in beach access); (3) Government Code sections 39933-39937 (implementing Cal. Const., art. XV, § 2, and requiring municipalities to maintain access to navigable waters); (4) Fish and Game Code section 6511 and Public Resources Code section 6008 (restrictions on sales and leases of public lands in Humboldt Bay in order to preserve public access); (5) Public Resources Code section 6210.4 (requiring the state to reserve convenient access to navigable waters in connection with the sale or other disposition of shoreline lands); and (6) Public Resources Code section 6323 (forbidding structures on artificially accreted lands so that such accretions will remain an unobstructed and open beach)." (*Gion*, p. 43.)

The court continued: "This court has in the past been less receptive to arguments of implied dedication when open beach lands were involved than it has when well-defined roadways are at issue . . . . With the increased urbanization of this state, however, beach areas are now as well-defined as roadways. This intensification of land use combined with the clear public policy in favor of encouraging and expanding public access to and use of shoreline areas leads us to the conclusion that the courts of this state must be as receptive to a finding of implied dedication of shoreline areas as they are to a finding of implied dedication of roadways." (*Gion*, p. 43.)

It was on this note that the *Gion* court concluded "that there was an implied dedication of property rights in both cases." (*Gion*, p. 43.)

We observe no purpose of the Supreme Court that the rules of *Gion* be applied to areas other than such "open beach lands" and "roadways" as were concerned in that case.

"It is elementary that the language used in any opinion is to be understood in the light of the facts and the issue then before the court."

(*McDowell & Craig* v. *City of Santa Fe Springs,* 54 Cal.2d 33, 38 [4 Cal.Rptr. 176, 351 P.2d 344].) The same rule has long been expressed in this manner: "It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent." (*Cohens* v. *Virginia,* 19 U.S. 264, 399 (6 Wheat. 120, 179) [5 L .Ed. 257, 290]; *Hart* v. *Burnett,* 15 Cal. 530, 598; *Efron* v. *Kalmanovitz,* 185 Cal.App.2d 149, 158 [8 Cal.Rptr. 107]; *Achen* v. *Pepsi-Cola Bottling Co.,* 105 Cal.App.2d 113, 125 [233 P.2d 74]; *Jones* v. *Summers,* 105 Cal.App. 51, 59 [286 P. 1093].)

It is of further significance that in *Gion* the *adversity* of the public use of the land in question was conceded, while here it was vigorously denied by defendants and found to be nonexistent by the trial court. The court in *Gion* stated: "Although there [was trial] evidence in both cases from which it might be inferred that owners preceding the present fee owners *acquiesced* in the public use of the land, *that argument has not been pressed before this court. We therefore turn to the issue of dedication by adverse use.*" (*Gion,* p. 39; italics added.) The parties there having assumed on appeal that the public use in their cases was adverse, the only issue considered by the court was the legal effect of that *adverse* use. *Gion* accordingly may not be deemed authority on the legal effect of a long continued *nonadverse* use of land under the here found evidentially implied consent or license of the owners. (See *McDowell & Craig* v. *City of Santa Fe Springs, supra; Cohens* v. *Virginia, supra; Hart* v. *Burnett, supra; Efron* v. *Kalmanovitz, supra; Achen* v. *Pepsi-Cola Bottling Co., supra; Jones* v. *Summers, supra.*)

It is also notable that the *Gion* court chose not to expressly overrule or disapprove any of the many authorities to which we have adverted, in their general application to "public dedication" and "prescriptive rights." "[O]verruling by implication is no more favored than repealing by implication, and important cases of record of recent origin are not ordinarily to be considered as overruled by implication." (16 Cal.Jur.3d, Courts, § 145, p. 260.)

We accordingly hold that the rules and rationale of *Gion* extend no further than to roads, beaches and shoreline areas, and that they are

inapposite to the open fields and hillsides of the inland areas of the defendants in the case at bench.

Yet to be considered are cross-appeals of the Atchison, Topeka and Santa Fe Railway Company, and Santa Fe Land Improvement Company defendant Western Title Guaranty Company has not appealed). By complaints in intervention they had, among other things, sought damages from the Club for erosion, scarring, removal of topsoil, and diminution of value, of their land. The trial court, denying such damages, found, in effect, that the Club's use of the land was with consent of the owners, and that although erosion of the land was caused by the Club, no diminution in value or other damages had occurred. These findings of fact were supported by substantial evidence; and we otherwise observe no error in the denial of damages.

For the several reasons we have stated, the judgment, as entered, will be affirmed.

It has become unnecessary to our determination of the instant appeals to consider other points raised by the parties.

The judgment is affirmed. Defendant Western Title Guaranty Company will recover its costs of appeal from plaintiff; otherwise the parties will stand their respective costs.

Molinari, P. J., concurred.

SIMS, J.—I concur in the decision to affirm the judgment on the ground that the evidence sustains the findings that there was no express or implied dedication and the use of the land was permissive. I reserve judgment on the issue of whether the rules and rationale of *Gion* is limited to roads, beaches and shoreline areas and is inapposite to open fields and hillsides of inland areas. It is conceivable that there may be situations in which areas adjacent to inland public lands or bodies of water are subject to the same rules. This is not such a case.