[S. F. No. 22560. In Bank. Feb. 19, 1970.]

THOMAS GION et al., Plaintiffs and Appellants, v.
CITY OF SANTA CRUZ, Defendant and Respondent.

[S. F. No. 22703. In Bank. Feb. 19, 1970.]

LESTER J. DIETZ et al., Plaintiffs and Appellants, v.
ROBERT B. KING et al., Defendants and Respondents.

(Two Cases.)

## COUNSEL

Lester J. Dietz and Lotus A. Dietz, in pro. per., Leo M. Cook, Timothy O. Stoen, Sullivan, Roche, Johnson & Farraher, Sullivan, Roche & Johnson, Vincent J. Mullins and Richard H. Wise, Jr., for Plaintiffs and Appellants.

Rodney R. Atchison, City Attorney, Atchison & Haile, Donald R. Haile, Bell & Cox and Charles R. Bell for Defendants and Respondents.

Thomas C. Lynch, Attorney General, Jay L. Shavelson, Assistant Attorney General, R. Frederic Fisher and Lillick, McHose, Wheat, Adams & Charles as Amici Curiae on behalf of Defendant and Respondent in No. 22560 and Plaintiffs and Appellants in No. 22703.

James R. Christiansen, City Attorney (Carpinteria), as Amicus Curiae on behalf of Defendant and Respondent in No. 22560.

## OPINION

**THE COURT.**—We consider these two cases together because both raise the question of determining when an implied dedication of land has been made.

*Gion* v. *City of Santa Cruz* concerns three parcels of land on the southern or seaward side of West Cliff Drive, between Woodrow and Columbia Streets in Santa Cruz. The three lots contain a shoreline of approximately 480 feet and extend from the road into the sea a distance varying from approximately 70 feet to approximately 160 feet. Two of the three lots are contiguous; the third is separated from the first two by approximately 50 feet. Each lot has some area adjoining and level with the road (30 to 40 feet above the sea level) on which vehicles have parked for the last 60 years. This parking area extends as far as 60 feet from the road on one parcel, but on all three parcels there is a sharp cliff-like drop beyond the level area onto a shelf area and then another drop into the sea. The land is subject to continuous, severe erosion. Two roads previously built by the city have been slowly eroded by the sea. To prevent future erosion the city has filled in small amounts of the land and placed supporting riprap in weak areas. The city also put an emergency alarm system on the land and in the early 1960's paved the parking area. No other permanent structures have ever been built on this land.

Since 1880, the City of Santa Cruz has had fee title to a road at some location near the present road. Also since 1880, there has been an area south or seaward of the road area that has been in private hands. As the area south of the road eroded, the city moved its road a short distance to the north. In 1932, after moving the road to its present location, the city gave a quitclaim deed for the land previously covered by the road, but no longer used as a road, to G. H. Normand, the owner and developer of the surrounding property. The area presently under dispute, therefore, includes an old roadbed. Most of the area, however, has never been used for anything but the pleasure of the public.

Since at least 1900 various members of the public have parked vehicles on the level area, and proceeded toward the sea to fish, swim, picnic, and view the ocean. Such activities have proceeded without any significant objection by the fee owners of the property. M. P. Bettencourt, who acquired most of the property in dispute in 1941 and sold it to Gion in 1958 and 1961, testified that during his 20 years of ownership he had occasionally posted signs that the property was privately owned. He conceded, however, that the signs quickly blew away or were torn down, that he never told anyone to leave the property, and that he always granted permission on the

few occasions when visitors requested permission to go on it. In 1957 he asked a neighbor to refrain from dumping refuse on the land.[1] The persons who owned the land prior to Bettencourt paid even less attention to it than did Bettencourt. Every witness who testified about the use of the land before 1941 stated that the public went upon the land freely without any thought as to whether it was public or privately owned. In fact, counsel for Gion offered to stipulate at trial that since 1900 the public has fished on the property and that no one ever asked or told anyone to leave it.

The City of Santa Cruz has taken a growing interest in this property over the years and has acted to facilitate the public's use of the land. In the early 1900's, for instance, the Santa Cruz school system sent all the grammar and high school students to this area to plant ice plant, to beautify the area and keep it from eroding. In the 1920's, the city posted signs to warn fishermen of the dangers from eroding cliffs. In the 1940's, the city filled in holes and built an embankment on the top level area to prevent cars from driving into the sea. At that time, the city also installed an emergency alarm system that connected a switch near the cliff to an alarm in the firehouse and police station. The city replaced a washed out guardrail and oiled the parking area in the 1950's, and in 1960-61 the city spent $500,000 to prevent erosion in the general area. On the specific property now in dispute, the city filled in collapsing tunnels and placed boulders in weak areas to counter the eroding action of the waves. In 1963, the city paved all of the level area on the property, and in recent years the sanitation department has maintained trash receptacles thereon and cleaned it after weekends of heavy use.

The Superior Court for the County of Santa Cruz concluded that the Gions were the fee owners of the property in dispute but that their fee title was "subject to an easement in defendant, City of Santa Cruz, a Municipal corporation, for itself and on behalf of the public, in, on, over and across said property for public recreation purposes, and uses incidental thereto, including, but not limited to, parking, fishing, picnicking, general viewing, public protection and policing, and erosion control, but not including the right of the City or the public to build any permanent structures thereon." This conclusion was based on the following findings of fact:

"The public, without having asked or received permission, has made con-

---

[1] Counsel for the Gions has argued on appeal that a 1956 Santa Cruz city ordinance (No. NS 266) forbade the fee owners from constructing any structures on the property (including "No Trespassing" signs) and that therefore this court should not consider the owners' non-action after 1956. The City of Santa Cruz was prepared to rebut this argument at the trial with evidence that the ordinance was in effect for a year and a half at most, but did not offer the proof because trial counsel for the Gions stipulated that the ordinance would not be an issue in the litigation and offered no evidence as to the effect of the ordinance. We cannot, therefore, now consider the ordinance.

tinuous and uninterrupted use of the said property for a period of time in excess of five (5) years preceding the commencement of this action, for public recreation purposes.

"The City of Santa Cruz, through its agents and employees, has continuously for a period in excess of five (5) years preceding the commencement of this action, exercised continuous and uninterrupted dominion and control over the said property, by performing thereon, grading and paving work, clean-up work, erosion control work, and by maintaining a planting program, and by placing and maintaining safety devices and barriers for the protection of the public using said property.

"Plaintiffs and plaintiffs' predecessors in title had full knowledge of the dominion and control exercised over said property by the City of Santa Cruz, and of the public user of said property throughout the period of said public user, for a period of time in excess of five (5) years preceding the commencement of this action."

In *Dietz* v. *King,* plaintiffs, as representatives of the public, asked the court to enjoin defendants from interfering with the public's use of Navarro Beach in Mendocino County and an unimproved dirt road, called the Navarro Beach Road, leading to that beach. The beach is a small sandy peninsula jutting into the Pacific Ocean. It is surrounded by cliffs at the south and east, and is bounded by the Navarro River and the Navarro Beach Road (the only convenient access to the beach by land) on the north. The Navarro Beach Road branches from a county road that parallels State Highway One. The road runs in a southwesterly direction along the Navarro River for 1,500 feet and then turns for the final 1,500 feet due south to the beach. The road first crosses for a short distance land owned by the Carlyles, who maintain a residence adjacent to the road. It then crosses land owned by Mae Crider and Jack W. Sparkman, proprietors of an ancient structure called the Navarro-by-the-Sea Hotel, and, for the final 2,200 feet, land now owned by defendants.

The public has used the beach and the road for at least 100 years. Five cottages were built on the high ground of the ocean beach about 100 years ago. A small cemetery plot containing the remains of shipwrecked sailors and natives of the area existed there. Elderly witnesses testified that persons traveled over the road during the closing years of the last century. They came in substantial numbers to camp, picnic, collect and cut driftwood for fuel, and fish for abalone, crabs, and finned fish. Others came to the beach to decorate the graves, which had wooden crosses upon them. Indians, in groups of 50 to 75 came from as far away as Ukiah during the summer months. They camped on the beach for weeks at a time, drying kelp and

catching and drying abalone and other fish. In decreasing numbers they continued to use the road and the beach until about 1950.

In more recent years the public use of Navarro Beach has expanded. The trial court found on substantial evidence that "For many years members of the public have used and enjoyed the said beach for various kinds of recreational activities, including picnicking, hiking, swimming, fishing, skin diving, camping, driftwood collecting, firewood collecting, and related activities." At times as many as 100 persons have been on the beach. They have come in automobiles, trucks, campers, and trailers. The beach has been used for commercial fishing, and during good weather a school for retarded children has brought its students to the beach once every week or two.

None of the previous owners of the King property ever objected to public use of Navarro Beach Road. The land was originally owned by a succession of lumber and railroad companies, which did not interfere with the public's free use of the road and beach. The Southern Pacific Land Company sold the land in 1942 to Mr. and Mrs. Oscar J. Haub who in turn sold it to the Kings in 1959. Mrs. Haub testified by deposition that she and her husband encouraged the public to use the beach. "We intended," she said, "that the public would go through and enjoy that beach without any charge and just for the fun of being out there." She also said that it "was a free beach for anyone to go down there," "you could go in and out as you pleased," and "[w]e intended that the beach be free for anybody to go down there and have a good time." Only during World War II, when the U.S. Coast Guard took over the beach as a base from which to patrol the coast, was the public barred from the beach.

In 1960, a year after the Kings acquired the land, they placed a large timber across the road at the entrance to their land. Within two hours it was removed by persons wishing to use the beach. Mr. King occasionally put up No Trespassing signs, but they were always removed by the time he returned to the land, and the public continued to use the beach until August 1966. During that month, Mr. King had another large log placed across the road at the entrance to his property. That barrier was, however, also quickly removed. He then sent in a caterpillar crew to permanently block the road. That operation was stopped by the issuance of a temporary restraining order.

The various owners of the Navarro-by-the-Sea property have at times placed an unlocked chain across the Navarro Beach Road on that property. One witness said she saw a chain between 1911 and 1920. Another witness said the chain was put up to discourage cows from straying and eating poisonous weeds. The chain was occasionally hooked to an upright

spike, but was never locked in place and could be easily removed. Its purpose apparently was to restrict cows, not people, from the beach. In fact, the chain was almost always unhooked and lying on the ground.

From about 1949 on, a proprietor of the Navarro-by-the-Sea Hotel maintained a sign at the posts saying, "Private Road—Admission 50¢—please pay at hotel." With moderate success, the proprietor collected tolls for a relatively short period of time. Some years later another proprietor resumed the practice. Most persons ignored the sign, however, and went to the beach without paying. The hotel operators never applied any sanctions to those who declined to pay. In a recorded instrument the present owners of the Navarro-by-the-Sea property acknowledged that "for over one hundred years there has existed a public easement and right of way" in the road as it crosses their property. The Carlyles and the previous owners of the first stretch of the Navarro Beach Road never objected to its use over their property and do not now object.

The Mendocino County Superior Court ruled in favor of defendants, concluding that there had been no dedication of the beach or the road and in particular that widespread public use does not lead to an implied dedication.

In our most recent discussion of common law dedication, *Union Transp. Co.* v. *Sacramento County* (1954) 42 Cal.2d 235, 240-241 [267 P.2d 10], we noted that a common law dedication of property to the public can be proved either by showing acquiescence of the owner in use of the land under circumstances that negate the idea that the use is under a license or by establishing open and continuous use by the public for the prescriptive period. ■ When dedication by acquiescence for a period of less than five years is claimed, the owner's actual consent to the dedication must be proved. The owner's intent is the crucial factor. (42 Cal.2d at p. 241, quoting from *Schwerdtle* v. *County of Placer* (1895) 108 Cal. 589, 593 [41 P. 448].) ■ When, on the other hand, a litigant seeks to prove dedication by adverse use, the inquiry shifts from the intent and activities of the owner to those of the public. The question then is whether the public has used the land "for a period of more than five years with full knowledge of the owner, without asking or receiving permission to do so and without objection being made by anyone." (42 Cal.2d at p. 240, quoting from *Hare* v. *Craig* (1929) 206 Cal. 753, 757 [276 P. 336].) As other cases have stated, the question is whether the public has engaged in "long-continued adverse use" of the land sufficient to raise the "conclusive and undisputable presumption of knowledge and acquiescence, while at the same time it negatives the idea of a mere license." (42 Cal.2d at p. 241, quoting from *Schwerdtle* v. *County of Placer, supra,* 108 Cal. 589, 593.)

In both cases at issue here, the litigants representing the public contend that the second test has been met. Although there is evidence in both cases from which it might be inferred that owners preceding the present fee owners acquiesced in the public use of the land, that argument has not been pressed before this court. We therefore turn to the issue of dedication by adverse use.

Three problems of interpretation have concerned the lower courts with respect to proof of dedication by adverse use: (1) When is a public use deemed to be adverse? (2) Must a litigant representing the public prove that the owner did not grant a license to the public? (3) Is there any difference between dedication of shoreline property and other property?

In determining the adverse use necessary to raise a conclusive presumption of dedication, analogies from the law of adverse possession and easement by prescriptive rights can be misleading. An adverse possessor or a person gaining a personal easement by prescription is acting to gain a property right in himself and the test in those situations is whether the person acted as if he actually claimed a personal legal right in the property. (*O'Banion* v. *Borba* (1948) 32 Cal.2d 145, 148, 151 [195 P.2d 10].) Such a personal claim of right need not be shown to establish a dedication because it is a public right that is being claimed. What must be shown is that persons used the property believing the public had a right to such use. This public use may not be "adverse" to the interests of the owner in the sense that the word is used in adverse possession cases. ■ If a trial court finds that the public has used land without objection or interference for more than five years, it need not make a separate finding of "adversity" to support a decision of implied dedication.

■ Litigants, therefore, seeking to show that land has been dedicated to the public need only produce evidence that persons have used the land as they would have used public land. If the land involved is a beach or shoreline area, they should show that the land was used as if it were a public recreation area. If a road is involved, the litigants must show that it was used as if it were a public road. ■ Evidence that the users looked to a governmental agency for maintenance of the land is significant in establishing an implied dedication to the public. (*Washington Blvd. Beach Co.* v. *City of Los Angeles* (1940) 38 Cal.App.2d 135, 137-138 [100 P.2d 828]; *Seaway Co.* v. *Attorney General* (Tex.Civ.App. 1964) 375 S.W.2d 923, 936-937.)

■ Litigants seeking to establish dedication to the public must also show that various groups of persons have used the land. If only a limited and definable number of persons have used the land, those persons may be able to claim a personal easement but not dedication to the public. An owner

may well tolerate use by some persons but object vigorously to use by others. If the fee owner proves that use of the land fluctuated seasonally, on the other hand, such a showing does not negate evidence of adverse user. "[T]he thing of significance is that whoever wanted to use [the land] did so . . . when they wished to do so without asking permission and without protest from the land owners." (*Seaway Co.* v. *Attorney General, supra,* (Tex.Civ.App.) 375 S.W.2d 923, 936.)

The second problem that has concerned lower courts is whether there is a presumption that use by the public is under a license by the fee owner, a presumption that must be overcome by the public with evidence to the contrary. (Compare *Rochex & Rochex, Inc.* v. *Southern Pac. Co.* (1932) 128 Cal.App. 474, 479 [17 P.2d 794], to *People* v. *Sayig* (1951) 101 Cal. App.2d 890, 897 [226 P.2d 702].) Counsel for the fee owners have argued that the following language from *F. A. Hihn Co.* v. *City of Santa Cruz* (1915) 170 Cal. 436, 448 [150 P. 62] is controlling: ". . . where land is uninclosed and uncultivated, the fact that the public has been in the habit of going upon the land will ordinarily be attributed to a license on the part of the owner, rather than to his intent to dedicate. (13 Cyc. 484.) This is more particularly true where the user by the public is not over a definite and specified line, but extends over the entire surface of the tract. (13 Cyc. 484.) It will not be presumed, from mere failure to object, that the owner of such land so used intends to create in the public a right which would practically destroy his own right to use any part of the property."[2]

We rejected that view, however, in *O'Banion* v. *Borba, supra,* 32 Cal.2d 145. With regard to the question of presumptions in establishing easements by prescription we said: "There has been considerable confusion in the cases involving the acquisition of easements by prescription, concerning the presence or absence of a presumption that the use is under a claim of right adverse to the owner of the servient tenement, and of which he has constructive notice, upon the showing of an open, continuous, notorious and peaceable use for the prescriptive period. Some cases hold that from that showing a presumption arises that the use is under a claim of right adverse to the owner. [Citations.] It has been intimated that the presumption does not arise when the easement is over unenclosed and unimproved land. [Citations.] Other cases hold that there must be specific direct evidence of an adverse claim of right, and in its absence, a presumption of permissive use is indulged. [Citations.] The preferable view is to treat the case the same as any other, that is, the issue is ordinarily one of fact, giving consideration to all the circumstances and the inferences that may be drawn

---

[2]The *Hihn* case was followed in *Manhattan Beach* v. *Cortelyou* (1938) 10 Cal.2d 653, 668 [76 P.2d 483]; *City of San Diego* v. *Hall* (1919) 180 Cal. 165, 168 [179 P. 889]; and *Whiteman* v. *City of San Diego* (1920) 184 Cal. 163, 172 [193 P. 98].

therefrom. The use may be such that the trier of fact is justified in inferring an adverse claim and user and imputing constructive knowledge thereof to the owner. There seems to be no apparent reason for discussing the matter from the standpoint of presumptions." (32 Cal.2d at pp. 148-149.)

No reason appears for distinguishing proof of implied dedication by invoking a presumption of permissive use. ■ The question whether public use of privately owned lands is under a license of the owner is ordinarily one of fact. We will not presume that owners of property today knowingly permit the general public to use their lands and grant a license to the public to do so. ■ For a fee owner to negate a finding of intent to dedicate based on uninterrupted public use for more than five years, therefore, he must either affirmatively prove that he has granted the public a license to use his property or demonstrate that he has made a bona fide attempt to prevent public use. ■ Whether an owner's efforts to halt public use are adequate in a particular case will turn on the means the owner uses in relation to the character of the property and the extent of public use. Although "No Trespassing" signs may be sufficient when only an occasional hiker traverses an isolated property, the same action cannot reasonably be expected to halt a continuous influx of beach users to an attractive seashore property. ■ If the fee owner proves that he has made more than minimal and ineffectual efforts to exclude the public, then the trier of fact must decide whether the owner's activities have been adequate. ■ If the owner has not attempted to halt public use in any significant way, however, it will be held as a matter of law that he intended to dedicate the property or an easement therein to the public, and evidence that the public used the property for the prescriptive period is sufficient to establish dedication.

A final question that has concerned lower courts is whether the rules governing shoreline property differ from those governing other types of property, particularly roads. Most of the case law involving dedication in this state has concerned roads and land bordering roads. (See, e.g., *Venice v. Short Line Beach Co.* (1919) 180 Cal. 447 [181 P. 658]; *Union Transp. Co. v. Sacramento County, supra,* 42 Cal.2d 235; *Schwerdtle v. County of Placer, supra,* 108 Cal. 589; *Hare v. Craig, supra,* 206 Cal. 753; *People v. Marin County* (1894) 103 Cal. 223 [37 P. 203]; *Diamond Match Co. v. Savercool* (1933) 218 Cal. 665 [24 P.2d 783]; *Hartley v. Vermillion* (1903) 141 Cal. 339 [74 P. 987].) This emphasis on roadways arises from the ease with which one can define a road, the frequent need for roadways through private property, and perhaps also the relative frequency with which express dedications of roadways are made. ■ The rules governing implied dedication apply with equal force, however, to land used by the public for purposes other than as a

roadway. In this state, for instance, the public has gained rights, through dedication, in park land (see, e.g., *Archer* v. *Salinas City* (1892) 93 Cal. 43 [28 P. 839]; *Phillips* v. *Laguna Beach Co.* (1922) 190 Cal. 180 [211 P. 225]; *Slavich* v. *Hamilton* (1927) 201 Cal. 299 [257 P. 60]) in athletic fields (see, e.g., *Morse* v. *Miller* (1954) 128 Cal.App.2d 237 [275 P.2d 545]; *E. A. Robey & Co.* v. *City Title Ins. Co.* (1968) 261 Cal.App.2d 517 [68 Cal.Rptr. 38]), and in beaches (see, e.g., *Washington Blvd. Beach Co.* v. *City of Los Angeles, supra,* 38 Cal.App.2d 135; *Morse* v. *Miller, supra,* 128 Cal.App.2d 237; *Morse* v. *E.A. Robey Co.* (1963) 214 Cal.App.2d 464 [29 Cal.Rptr. 734]; *E.A. Robey & Co.* v. *City Title Ins. Co., supra,* 261 Cal.App.2d 517).

Even if we were reluctant to apply the rules of common law dedication to open recreational areas, we must observe the strong policy expressed in the Constitution and statutes of this state of encouraging public use of shoreline recreational areas.

█ Among the statutory provisions favoring public ownership of shoreline areas is Civil Code section 830. That section states that absent specific language to the contrary, private ownership of uplands ends at the high-water mark. The decisions of this court have interpreted this provision to create a presumption in favor of public ownership of land between high and low tide. (See *Kimball* v. *MacPherson* (1873) 46 Cal. 103, 108; *Upham* v. *Hosking* (1882) 62 Cal. 250, 258; *Long Beach Land & Water Co.* v. *Richardson* (1886) 70 Cal 206, 209 [11 P. 695]; *Freeman* v. *Bellegarde* (1895) 108 Cal. 179, 185 [41 P. 289]; *People* v. *California Fish Co.* (1913) 166 Cal. 576, 591-596 [138 P. 79]; *Abbott Kinney Co.* v. *City of Los Angeles* (1959) 53 Cal.2d 52, 57 [346 P.2d 385].)

█ There is also a clearly enunciated public policy in the California Constitution in favor of allowing the public access to shoreline areas: "No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water. . . ." (Art. XV, § 2.)

Recreational purposes are among the "public purposes" mentioned by this constitutional provision. (*Bohn* v. *Albertson* (1951) 107 Cal.App.2d 738, 744 [238 P.2d 128]; *Lamprey* v. *State* (1893) 52 Minn. 181 [53 N.W. 1139]; *Atkins* v. *City of Durham* (1936) 210 N.C. 295 [186 S.E. 330, 333]; *Martin* v. *City of Asbury Park* (1935) 114 N.J.L. 298 [176 A. 172, 173]; *Ottawa Hunting Assn.* v. *State* (1955) 178 Kan. 460 [289 P.2d 754, 758]; *Village of Grosse Point Woods* v. *Village of St. Clair Shores* (1949) 326 Mich. 376 [40 N.W.2d 190, 191];

*In re Opinion of the Justices* (1937) 297 Mass. 567 [8 N.E.2d 753, 756]; *Marshall* v. *Rose* (1948) 213 S.C. 428 [49 S.E.2d 720, 725].) ▇▇▇ Although article XV section 2 may be limited to some extent by the United States Constitution it clearly indicates that we should encourage public use of shoreline areas whenever that can be done consistently with the federal Constitution.

Other legislative enactments that indicate the strong public policy in favor of according public access to the coast include (1) article I, section 25 of the California Constitution (guaranteeing the right to fish); (2) Government Code sections 54090-54093 (relating to discrimination in beach access); (3) Government Code sections 39933-39937 (implementing Cal. Const., art. XV, § 2, and requiring municipalities to maintain access to navigable waters); (4) Fish and Game Code section 6511 and Public Resources Code section 6008 (restrictions on sales and leases of public lands in Humboldt Bay in order to preserve public access); (5) Public Resources Code section 6210.4 (requiring the state to reserve convenient access to navigable waters in connection with the sale or other disposition of shoreline lands); and (6) Public Resources Code section 6323 (forbidding structures on artificially accreted lands so that such accretions will remain an unobstructed and open beach).

This court has in the past been less receptive to arguments of implied dedication when open beach lands were involved than it has when well-defined roadways are at issue (Compare *F. A. Hihn Co.* v. *City of Santa Cruz, supra,* 170 Cal. 436 to *Schwerdtle* v. *County of Placer, supra,* 108 Cal. 589.) With the increased urbanization of this state, however, beach areas are now as well-defined as roadways. ▇▇▇ This intensification of land use combined with the clear public policy in favor of encouraging and expanding public access to and use of shoreline areas leads us to the conclusion that the courts of this state must be as receptive to a finding of implied dedication of shoreline areas as they are to a finding of implied dedication of roadways. (For a similar result see *State* ex rel. *Thornton* v. *Hay* (1969) 254 Ore. 584 [462 P.2d 671].)

▇▇▇ We conclude that there was an implied dedication of property rights in both cases. In both cases the public used the land "for a period of more than five years with full knowledge of the owner, without asking or receiving permission to do so and without objection being made by anyone." (*Union Transp. Co.* v. *Sacramento County, supra,* 42 Cal.2d 235, 240 quoting from *Hare* v. *Craig, supra,* 206 Cal. 753, 757.) In both cases the public used the land in public ways, as if the land was owned by a government, as if the land were a public park.

In *Gion* v. *City of Santa Cruz,* the public use of the land is accentuated

by the active participation of the city in maintaining the land and helping the public to enjoy it. The variety and long duration of these activities indicate conclusively that the public looked to the city for maintenance and care of the land and that the city came to view the land as public land.

No governmental agency took an active part in maintaining the beach and road involved in *Dietz* v. *King, supra,* but the public nonetheless treated the land as land they were free to use as they pleased. The evidence indicates that for over a hundred years persons used the beach without regard to who owned it. A few persons may have believed that the proprietors of the Navarro-by-the-Sea Hotel owned or supervised the beach, but no one paid any attention to any claim of the true owners. The activities of the Navarro-by-the-Sea proprietors in occasionally collecting tolls had no effect on the public's rights in the property because the question is whether the public's use was free from interference or objection by the fee owner or persons acting under his direction and authority. (*Union Transp. Co.* v. *Sacramento County, supra,* 42 Cal.2d 235, 240, 241.)

The rare occasions when the fee owners came onto the property in question and casually granted permission to those already there have, likewise, no effect on the adverse user of the public. By giving permission to a few, an owner cannot deprive the many, whose rights are claimed totally independent of any permission asked or received of their interest in the land. (*Seaway Co.* v. *Attorney General, supra* (Tex. Civ. App.) 375 S.W.2d 923, 933-936.) If a constantly changing group of persons use land in a public way without knowing or caring whether the owner permits their presence, it makes no difference that the owner has informed a few persons that their use of the land is permissive only.

 The present fee owners of the lands in question have of course made it clear that they do not approve of the public use of the property. Previous owners, however, by ignoring the wide-spread public use of the land for more than five years have impliedly dedicated the property to the public. Nothing can be done by the present owners to take back that which was previously given away. In each case the trial court found the elements necessary to implied dedication were present—use by the public for the prescriptive period without asking or receiving permission from the fee owner. There is no evidence that the respective fee owners attempted to prevent or halt this use. It follows as a matter of law that a dedication to the public took place. The judgment in *Gion* is affirmed.[3] The judgment in

---

[3]Appellants in *Gion* have argued that Civil Code section 802 is violated by the order granting respondents an easement, because section 802 lists all the possible non-appurtenant easements and does not include an easement for general recreation. There is nothing in the legislative history or in subsequent cases that indicates to us that

*Dietz* is reversed with directions that judgment be entered in favor of plaintiffs.

*t*

---

section 802 was meant to be exclusive. The examples listed are illustrative, and the easement granted in *Gion* does not differ markedly from those specifically mentioned.

Appellants in *Gion* also argued that the trial court's order granting an easement to the public was improper because whenever land is dedicated for park purposes fee ownership rather than just an easement must pass. It is true that the cases that have recognized a dedication for park purposes have also indicated that a full fee interest was transferred (*Archer* v. *Salinas City, supra,* 93 Cal. 43; *Slavich* v. *Hamilton, supra,* 201 Cal. 299; *Washington Blvd. Beach Co.* v. *City of Los Angeles, supra,* 38 Cal. App.2d 135; *Morse* v. *E. A. Robey Co., supra,* 214 Cal.App.2d 464; see generally, Comment, *Dedication of Land in California* (1965) 53 Cal.L.Rev. 559, 566, but there is no reason why this must always be the case.