Filed 10/23/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| TIBURON/BELVEDERE RESIDENTS UNITED TO SUPPORT THE TRAILS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>MARTHA COMPANY,<br><br>    Defendant and Respondent. | A157073<br><br>(Marin County<br>Super. Ct. No. CIV 1703276) |

Tiburon/Belvedere Residents United to Support the Trails
(TRUST) appeals from a judgment entered in respondent Martha
Company's (Martha) favor after a court trial.  TRUST argues that,
nearly 50 years ago, the public's use of trails on Martha's property
established a recreational easement under the doctrine of implied
dedication and that the trial court erred in reaching a contrary result.
We disagree, conclude the trial court's findings are supported by
substantial evidence, and affirm.

### BACKGROUND

### A.

A private landowner may transfer (the legal term is dedicate) an
interest in land to the public for no compensation.  (*Scher v. Burke*
(2017) 3 Cal.5th 136, 141 (*Scher*); *Friends of Hastain Trail v. Coldwater
Development LLC* (2016) 1 Cal.App.5th 1013, 1027 (*Hastain Trail*).)  A

dedication may be express or implied, but both require an offer of dedication and acceptance of that offer. (*Scher, supra,* 3 Cal.5th at p. 141.) An offer to dedicate may be implied in fact when there is proof that the owner consented to the dedication. (*Ibid.*) An offer may be implied by law when the public has used the land openly and continuously, as if the users believed the public had a right to do so, without objection by the landowner. (*Ibid.*; *Gion v. City of Santa Cruz* (1970) 2 Cal.3d 29, 38-39 (*Gion*).) Significant, longtime use by the public provides constructive notice to the landowner that the property is at risk of dedication; if the landowner takes no serious steps to discourage the use, the law conclusively presumes that the landowner has agreed to the dedication. (See *Gion*, 2 Cal.3d at pp. 38-41.)

In *Gion*, our Supreme Court held that an implied by law dedication is established when "the public has used the land 'for a period of more than five years with full knowledge of the owner, without asking or receiving permission to do so and without objection being made by anyone.' " (*Gion, supra,* 2 Cal.3d at p. 38.) Civil Code section 1009, subdivision (b),[1] abrogated the *Gion* decision prospectively, which is why the dispute before us centers on the five-year period preceding section 1009's effective date (March 4, 1972). (Stats. 1971, ch. 941, § 2; *Scher, supra*, 3 Cal.5th at p. 147; *Hastain Trail, supra,* 1 Cal.App.5th at p. 1028.) Once a dedication is established, "[n]othing can be done . . . to take back that which was previously given away." (*Gion, supra*, 2 Cal.3d at p. 44.)

---

[1] Undesignated statutory references are to the Civil Code.

**B.**

Martha owns 110 acres of undeveloped land on the Tiburon peninsula, near the communities of Tiburon and Belvedere. The property was used for cattle grazing until 1959. Martha has owned the property since the 1920s, and the company has at all relevant times been owned and controlled by members of the Reed family.

The property is bounded by Paradise Drive to the north and east, a residential neighborhood (Hillhaven) to the south, and what is now the Old St. Hilary's Open Space Preserve to the west. Four roads essentially dead-end at the property: Spanish Trail Road, Ridge Road, Mountain View Drive, and Straits View Drive. The property affords views of Angel Island, San Francisco, and the Golden Gate Bridge.

In 2017, TRUST filed a complaint to quiet title, in favor of the public, to recreational easements over four trails on the property—the Ridge Trail, the Spanish Trail, and northern and southern trails that connect the two named trails. The trails can be accessed from approximately seven points at the boundary of the property. TRUST proclaims its mission is to "save these trails, not only for the present, but to save them into the future and combine them with other trails to form a network for the public to enjoy."

**C.**

The case proceeded to a bench trial. TRUST's 28 witnesses testified generally that, during the five-year period preceding March 4, 1972, they, and their occasional guests, used the trails for various forms of recreation, including hiking, running, dog walking, motor biking, biking, horseback riding, bird watching, cardboard sledding, and picnicking. TRUST witnesses testified that they saw others, some

3

of whom they knew and others whom they did not know, frequently using the trails in similar ways.

Although a few of TRUST's witnesses lived in other parts of Tiburon or Belvedere at the time they used the trails, the vast majority lived in the Tiburon neighborhoods immediately surrounding the property. Only one of TRUST's witnesses lived outside of Tiburon or Belvedere, but when he used the trails he was a neighbor's guest. Almost half of TRUST's witnesses were under the age of 18 in 1967.

Most of TRUST's witnesses testified that they never requested or received permission to use the trails and that during the relevant period no one ever objected to their use. Some of TRUST's witnesses believed the public owned the trails, some did not know whether anyone owned them, and still others knew the land was privately owned but felt no need to seek permission from the owner to use the trails. One witness explained, "Tiburon was pretty open and relaxed, and we could go anyplace we wanted to[.]" Another witness said he was "[t]oo young . . . to consider whether I would ask permission."

Some of TRUST's witnesses stated there had been no barriers blocking access to the trails. The majority remembered that there *had* been gates or old fences of some kind where the property line intersected the trails, but these did not block their access to the property. With only a couple of exceptions, TRUST's witnesses testified that they did not remember seeing "no trespassing" or "private property" signs on the property.

TRUST's aerial photography expert, David Ruiz, testified that aerial photos taken of the property between 1946 and 1972 showed that the trails appeared between 1953 and 1963 and that trail use increased

4

between 1967 and 1972, as development increased in the surrounding neighborhoods. According to Ruiz, the four trails were well established and continuously used in the latter period. Ruiz opined that many people, coming from a variety of access points, used the trails daily during the relevant period. However, Ruiz conceded he had no way of knowing how many people used the trails with the owner's permission or the number who trespassed.

## D.

Martha's witnesses, including several members of the Reed family, painted a different picture. They testified that, during the relevant period, fences, gates, and "no trespassing" signs were in place at trail access points. Trespassers frequently cut wires in the fencing and removed signs, necessitating continual repairs.

Edgar Reed was the caretaker of the property in the 1960s and 1970s. He lived across the street with his wife and three children—Patricia, Mark, and Richard. Between 1967 and 1972, the Reed family gave permission to certain friends and neighbors to camp and ride minibikes or horses on the property. Martha also leased portions of the property for grazing and corralling horses.

Edgar died in 1989, but his children and other relatives testified that for decades, including the relevant period, he regularly patrolled the property, posted "no trespassing" signs, maintained fencing, removed improvements installed by trespassers, and asked trespassers to leave. Other members of the family, including Patricia, Mark, and Richard, assisted in that effort, and photographs corroborated the existence of fencing and signs. Martha produced witnesses who used the property as children during the relevant period and recalled that

5

Edgar Reed patrolled the property and, if he saw them, would kick them off.

## E.

The trial court concluded TRUST failed to show that the public's use of the trails was sufficient "to make a 'conclusive and undisputable presumption of knowledge and acquiescence.' " In its statement of decision, the court reasoned: "It is a high standard to take away a party's land in favor of a public dedication. *Hastain Trail, supra,* 1 Cal.App.5th at p. 1032. In this case that standard has not been met. [¶] The evidence from 28 individuals on behalf of TRUST was that the trails were being used without permission, some trails more than others, during the five-year period. The evidence was also clear that most of these witnesses were nearby neighbors to the property and many were children at the time."

The trial court continued: "There was also credible evidence that the property's owners regularly repaired the fences surrounding the property and repeatedly posted 'No Trespassing' signs (many of which were apparently removed by trespassers). There was also evidence that the owners asked unpermitted trespassers to leave. In addition, there was evidence that the one person responsible for this property during the relevant period regularly patrolled it. Of course, one person patrolling 110 undeveloped acres could not effectively encounter every trespasser. The court believes that these efforts were sufficient; and that the owners should not be reasonably expected to take greater actions . . . to avoid the presumption of public dedication." It was

6

unnecessary for the trial court to decide whether a laches defense applied.  The court entered judgment for Martha.

## DISCUSSION

### A.

Whether a public dedication can be implied by law is highly fact dependent (*County of Los Angeles v. Berk* (1980) 26 Cal.3d 201, 216; *Gion, supra*, 2 Cal.3d at p. 41; *Friends of the Trails v. Blasius* (2000) 78 Cal.App.4th 810, 822 (*Blasius*)), and we review the trial court's decision for substantial evidence.  (*Hastain Trail, supra*, 1 Cal.App.5th at p. 1029.)  "In doing so, we accept as true all evidence tending to establish the correctness of the trial court's findings, take into account all reasonable inferences that could lead to the same conclusion, and resolve every substantial conflict in the evidence in favor of the findings."  (*Ibid*.)  We review de novo the trial court's interpretation of law.  (See *Prout v. Department of Transportation* (2018) 31 Cal.App.5th 200, 211.)

### B.

TRUST argues that the trial court applied the wrong legal standard by discounting the testimony of neighbors and of witnesses who were children during the relevant period.  We disagree.

To establish an implied dedication, the general public must use the property.  The ultimate question is "whether the *public* has engaged in 'long-continued adverse use' of the land sufficient to raise the 'conclusive and undisputable presumption of knowledge and acquiescence.'"  (*Gion, supra*, 2 Cal.3d at p. 38, italics added.)  The public must demonstrate "through its actions that its members believed that they had a right to use the property as they did" and that belief

7

was reasonable in light of the circumstances. (*County of Los Angeles v. Berk, supra,* 26 Cal.3d at p. 216.) The use "must 'clearly indicate to the owner that his property is in danger of being dedicated.' " (*Hastain Trail, supra,* 1 Cal.App.5th at p. 1029.) A plaintiff must show "that 'the public has engaged in "long-continued adverse use" ' " that negates " ' "the idea of a mere license" ' or neighborly accommodation." (*Id.* at p. 1035; accord, *Gion, supra,* 2 Cal.3d at p. 38.)

While neighbors are members of the general public, and their testimony is relevant, use by neighbors is not equivalent to use by the general public. As our Supreme Court has stated, a plaintiff must demonstrate that "various groups of persons," not a "limited and definable number of persons," have freely and openly used the land. (*Gion, supra,* 2 Cal.3d at pp. 39, 40.) When the predominant users are neighbors, the landowner may have simply tolerated their use as a neighborly accommodation. (See *id.* at pp. 39-40; *Hastain Trail, supra,* 1 Cal.App.5th at p. 1029.) When, on the other hand, the owner tolerates (for five years without objection) use that is substantial, diverse, and sufficient to convey notice that the general public believes it has a right to use the property, the law deems it fair to presume conclusively that the owner had notice of the public use and acquiesced to it. (See *Gion, supra,* 2 Cal.3d at p. 39; *Blasius, supra,* 78 Cal.App.4th at pp. 825-826, fn. 7.)

The risk of dedication should be more obvious to a landowner when large numbers of people, coming from diverse groups within the general public, are using the landowner's property. For example, widespread public use indicates a more common belief in the community that the property is available for public use; it may include

8

more visitors that the owner does not recognize; and it may be more visible because, unlike locals, the general public may need to use cars and parking to visit the property.

Children present a similar problem. We need not dispute that they are members of the public and that their testimony is relevant. (But see *Hastain Trail*, 1 Cal.App.5th at p. 1041 (Chaney, J., concurring) [children are "born trespassers" who cannot establish a reasonable belief by the public of its right to use property].) The children here all lived locally; they were a subset of the neighbors. They do not supply the missing diversity.

The trial court did not err. It pointed out the limitations in TRUST's evidence, which demonstrated public recreational use that was *not* diverse or substantial because the trails were primarily used by a relatively small group of neighbors, a significant number of whom were children. In doing so, the trial court did nothing more than fulfill its duty to decide whether the public's use of the four trails was sufficient to put Martha on notice of a risk of dedication. (See *Gion, supra,* 2 Cal.3d at pp. 39-40; *Hastain Trail, supra*, 1 Cal.App.5th at pp. 1029, 1035.)

## C.

Substantial evidence supports the trial court's finding that the trails were insufficiently used by the public.

The trails were no doubt used by local individuals, families, and groups of children, along with their occasional guests, for hiking, bike riding, picnicking, and other recreational pursuits. But substantial evidence suggests there were never more than a few people on the trails at any given time. Indeed, several of TRUST's witnesses testified

9

they used the trails to be alone or to engage in activities that would have been dangerous in more crowded settings, such as riding motorcycles.

For the reasons explained above, the users were not diverse because they were primarily neighbors and, frequently, neighborhood children. Finally, in contrast to *Gion*, TRUST does not rely on any evidence that a public entity maintained the trails or any associated facilities. (See *Gion, supra,* 2 Cal.3d at pp. 35, 43-44 [city paved part of property for parking, maintained trash cans, took measures to prevent erosion].)

TRUST's expert witness did not fill the evidentiary void. The expert opined, after reviewing aerial photographs, that the four trails were used frequently and continuously between 1967 to 1972. But his opinion was of limited assistance, as the existence of the trails was not in dispute, and TRUST's expert had no way of knowing whether the trails were used by diverse groups or whether they were used with the owner's permission.

TRUST did not meet its burden. Substantial evidence supports the trial court's finding of insufficient use by the general public. (See *Gion, supra,* 2 Cal.3d at pp. 39, 40; *Hastain Trail, supra,* 1 Cal.App.5th at p. 1035; *Blasius, supra,* 78 Cal.App.4th at pp. 825-826, fn. 7.)

### D.

We reject TRUST's argument that the trial court imposed a higher burden of proof than required by law or exhibited "hostility" toward the doctrine of implied dedication. In its statement of decision, the trial court merely referred to the high legal standard that public use must meet in order to put a landowner on notice of the risk of

10

implied dedication.  (See, e.g., *Gion, supra*, 2 Cal.3d at p. 38 ["the question is whether the public has engaged in 'long continued adverse use' of the land sufficient to raise the 'conclusive and indisputable presumption of knowledge and acquiescence' "]; *Hastain Trail, supra,* 1 Cal.App.5th at p. 1032 [" 'If a landowner's intent to dedicate property to public use is to be implied, that purpose must *clearly* appear from the surrounding circumstances'"], italics added; *Hanshaw v. Long Valley Road Assn.* (2004) 116 Cal.App.4th 471, 482 ["where an intent to dedicate is implied as a legal fiction from the nature of public usage, the caselaw requires a *high standard of usage*, lest private property rights be too easily diminished"], italics added & disapproved on another point by *Scher, supra,* 3 Cal.5th at pp. 149-150 & fn. 5.)

### E.

Even if we assume, for the sake of argument, that TRUST showed substantial, diverse, and sufficient public use, substantial evidence also supports the trial court's finding that Martha made adequate bona fide attempts to prevent public use.  (*Gion, supra*, 2 Cal.3d at p. 41.)

### 1.

Once a plaintiff has shown the requisite public use, the burden shifts to the landowner to "either affirmatively prove that he has granted the public a license to use his property or demonstrate that he has made a *bona fide attempt* to prevent public use."  (*Gion, supra*, 2 Cal.3d at p. 41.)

While an owner's efforts may have been so minimal as to be inadequate as a matter of law, ordinarily the question is factual. (*County of Los Angeles v. Berk, supra*, 26 Cal.3d at p. 216; *Gion, supra,*

11

2 Cal.3d at p. 41 [when owner "has not attempted to halt public use in any significant way, . . . it will be held as a matter of law that he intended to dedicate the property"].) "Whether an owner's efforts to halt public use are adequate in a particular case will turn on the means the owner uses in relation to the character of the property and the extent of public use. Although 'No Trespassing' signs may be sufficient when only an occasional hiker traverses an isolated property, the same action cannot reasonably be expected to halt a continuous influx of beach users to an attractive seashore property." (*Gion, supra,* at p. 41.) An owner's efforts suffice if, considering all the circumstances, they would put a reasonable member of the public on notice that her use is unauthorized. (*County of Los Angeles v. Berk, supra,* 26 Cal.3d at p. 216.)

## 2.

TRUST, in effect, asks us to ignore the trial court's weighing of conflicting evidence. According to TRUST, we should disregard the Reed family's evidence of signs, fences, gates, and patrols prior to the *Gion* decision (March 4, 1972) as self-serving and not credible. The argument is unpersuasive.

The trial court resolved the conflict in favor of Martha when it found that Martha "regularly repaired" fences and "repeatedly posted" no trespassing signs at trail access points. That finding was adequately supported by evidence that members of the Reed family repaired gates or fences to block access to the trails at the property line, posted no-trespassing signs, and ejected some (but certainly not all) trespassers during the relevant period. Photographs corroborated their testimony.

12

No doubt, Martha's efforts were imperfect. Numerous witnesses testified that the fencing was frequently cut or otherwise easy to circumvent and that trespassers often removed "private property" and no-trespassing signs. And, trespassers *did* access the trails.

However, an owner's efforts to prevent public access need not be wholly effective to be adequate, especially if the area is undeveloped and public use is light. (See *County of Orange v. Chandler-Sherman Corp.* (1976) 54 Cal.App.3d 561, 566-567 [substantial evidence supports trial court's no dedication finding when no more than 12 to 15 people used the 2,000-foot beach at any given time, no government role in maintenance, and owner "took reasonable and significant, although not necessarily effective, measures to control [public] use"].)

Here, the property has always been large, undeveloped, and heavily vegetated. It also has steep slopes, making it difficult to see the entire property from any one vantage point. At the relevant time, Tiburon was "very rural" and had experienced "very little development." The geography of the Tiburon peninsula itself made these trails even more remote and inaccessible to anyone who did not live immediately nearby. It also bears repeating that the amount and variety of public use in this case was significantly less than that involved in *Gion* or *Blasius*. (See *Gion, supra*, 2 Cal.3d at pp. 34-37; *Blasius, supra*, 78 Cal.App.4th at p. 819.) In these circumstances, Martha's maintenance of fences, gates, and signs at trail access points is significant.

The trial court could reasonably find that Martha's efforts put trespassers on notice that their use was unauthorized. Particularly with a rural property, fences and gates across a trail can make the

13

owner's intent clear, even without "no trespassing" signs. And even when a particular fence or gate was in disrepair, users could not reasonably believe they had the right to use the trails if they ducked through openings in barbed wire fencing or stepped over chains, gates, or downed fence wires, near a "no trespassing" sign, to do so. There was also a running battle between some users, who took down signs and fences, and the Reed family, who repaired them, which further indicates both that the users did not believe that they had a right to use the property and that the Reeds made bona fide efforts to deter them.

In short, this is not a case in which the landowner was indifferent to public use of its property or its efforts were so anemic that we can impute to it an intention to dedicate the trails as a matter of law. (See *Gion*, 2 Cal.3d at p. 41; cf. *City of Long Beach v. Daugherty* (1977) 75 Cal.App.3d 972, 978 [landowner's attempts to remove only " 'rowdy' " users from beach inadequate to negate implied dedication].) Substantial evidence supports the trial court's finding that Martha's attempts to deter trespassers showed it did not acquiesce to public dedication. We need not reach the parties' remaining arguments.[2]

## DISPOSITION

The judgment is affirmed. Martha Company is awarded its costs on appeal.

---

[2] Martha asks us to take judicial notice of excerpts from Marin County's Draft Environmental Impact Report prepared for proposed development on the property. We deny the request for judicial notice because Martha fails to show the excerpts are relevant to the implied dedication question. (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 544, fn. 4.)

14

_____
BURNS, J.


We concur:


_____
NEEDHAM, ACTING P.J.


_____
REARDON, J.*


A157073


* Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15

Superior Court of Marin County, No. CIV1703276, Hon. Roy Chernus

Lukens Law Group, William M. Lukens; Cotchett Pitre & McCarthy LLP, Joseph Winters Cotchett, Eric J. Buescher, and Alison E. Cordova for Plaintiff and Appellant.

Cox Castle & Nicholson LLP, Andrew B. Sabey, Jonathan S. Kitchen, and James M. Purvis for Defendant and Respondent.

Shute, Mihaly & Weinberger, Fran M. Layton and Lauren Mary Tarpey for The Sierra Club and Marin Conservation League as Amici Curiae on behalf of Plaintiff and Appellant.

Burke Williams & Sorensen LLP, Benjamin Louis Stock and Joanne Leah Castella for Town of Tiburon as Amicus Curiae on behalf of Plaintiff and Appellant.