Opinion
CHANEY, J.
Defendants Lydda Lud, LLC (Lydda Lud), and Coldwater Development LLC (Coldwater) appeal from a judgment declaring a public trail easement was established by public dedication through defendants’ property for hiking, jogging, and dog walking. Defendants contend the trial court erred in finding a public dedication of such an easement. We conclude no substantial evidence supports the court’s finding that the public acquired an easement through defendants’ property by implied dedication as provided for under Gion v. City of Santa Cruz (1970) 2 Cal.3d 29 [84 Cal.Rptr. 162, 465 P.2d 50] (Gion) (consolidated with Dietz v. King). We therefore reverse the judgment and the subsequent award of attorney fees to plaintiffs.
FACTUAL AND PROCEDURAL SUMMARY
A. The Peak Trail
In the early part of the last century, the Beverly Hills and Los Angeles fire departments constructed and maintained fire roads in the cities’ wilderness areas to facilitate prevention and suppression of wildfires. In mountainous *1017 areas the fire roads were originally situated atop ridgelines, but by 1940 new roads had been constructed at lower elevations for ease of use and to mitigate erosion. The new fire roads ran near to and roughly parallel with the ridgelines, and the original roads were abandoned.
This litigation involves two parallel fire roads, an older one and its newer replacement. The older road climbed to and ran along an approximately 400-foot-long ridgeline running roughly north and south in a steep, narrow, canyon-type area of chaparral and oakwood in Los Angeles, approximately half a mile west of Coldwater Canyon Drive and a mile east of Lake Drive. By 1940, this road had been abandoned in favor of a new fire road that ran immediately to the west of the ridgeline and roughly parallel to it, but at a lesser elevation. Some hikers continued to use the abandoned road, and it came to be called the “Peak Trail” by some because it led to a high point in the terrain that afforded a 360 degree view of Los Angeles. A permanent survey marker was installed at the summit of the Peak Trail in 1952, becoming a hiking destination. The Peak Trail was situated wholly on private property.
B. The Hastain/Coldwater Trail
By 1940, the older fire road had been replaced by the “Hastain Fire Road,” which began at Coldwater Canyon Drive and ran south southwest for a time before meandering generally west to Lake Drive, like a backwards lazy L. The northeastern half of the Hastain Fire Road ran through undeveloped private property, some of it owned by defendants’ predecessors, and the southwestern half ran through Franklin Canyon Park, which is public property.
The Hastain Fire Road was used by hikers, bicyclists, equestrians and dog walkers, some of whom called it the “Hastain Trail” and some the “Coldwater Trail.” These users could access the road either from the northeast at Coldwater Canyon Drive or southwest at Lake Drive.
Before 2004, a hiker on the Hastain Trail could transition to the roughly parallel Peak Trail by climbing a moderately steep embankment. In 2004, grading reduced this climb, making the Peak Trail more accessible.
C. Development Along the Trails
In the early 1990’s, residential construction began where the Hastain Fire Road started at Coldwater Canyon Drive and moved southward, roughly following the road. By the time of trial, approximately 17 private residences existed in a gated community along the road, and that portion of it taken over *1018 by the development was rededicated as Beverly Ridge Terrace, a private road. This development also eliminated the Peak Trail north of its summit, such that by the time of trial both the Hastain Fire Road and Peak Trail were roughly half their original lengths, their northern halves having been either rededicated or eliminated. Both now began independently at the southern border of the Beverly Ridge community, proceeded in parallel roughly southwestward, and “joined” (via an embankment) after roughly 230 feet, after which the Hastain Fire Road continued generally southwestward to Franklin Canyon Park and on to Lake Drive.
The next four lots running south from the Beverly Ridge community were purchased by Coldwater in 2011, and the two south from those were purchased by Lydda Lud in 2006. Franklin Canyon Park begins after the southernmost of these six lots, which remain undeveloped except for the previously mentioned 2004 grading. The Hastain Fire Road runs through these lots and through Franklin Canyon Park to Lake Drive, with a momentary emergence from the park into a noncontiguous lot owned by Lydda Lud. Mohamed Hadid, the managing member of both Coldwater and Lydda Lud, planned to build large homes on the parcels, believing this development too would result in relocation and rededication of a portion of the Hastain Fire Road. Hadid obtained the required permits and, in 2011, recommenced grading.
D. Litigation
Plaintiff Ellen Scott, who often used the Hastain Trail, observed the 2011 grading activity on defendants’ property and organized six or seven fellow users into an association called the “Friends of the Hastain Trail,” the purpose of which was to prove the trail had been dedicated to the public by operation of law as a result of its use by the public for a prescriptive period of at least five continuous years prior to March 1972.[1] Scott created a Web site and sent e-mails and distributed fliers seeking “legacy hikers,” i.e., those who had hiked the trail prior to 1972.
In September 2011, Scott and the Friends of the Hastain Trail filed a complaint to quiet title to a public recreational trail easement through defendants’ property. They alleged the Hastain Trail had been impliedly dedicated to the public as a result of 50 years of public use, including five years of open and continuous use immediately prior to March 1972. Plaintiffs sought injunctive relief preventing defendants from blocking or eliminating the trail.
In April 2012, the Mountains Recreation and Conservation Authority (the MRCA), a partnership between the Santa Monica Mountains Conservancy *1019 and two park districts, joined the litigation by filing a complaint in intervention. We will refer to Scott, the Friends of the Hastain Trail and the MRCA as “plaintiffs.”
Defendants answered the complaints and asserted affirmative defenses, including laches, unclean hands, waiver, and the “Lack of a Basis for Injunctive Relief.” According to defendants, the Hastain Trail was actually a fire road of the sort that is routinely relocated or rededicated to accommodate land development. Defendants disputed the existence of the Peak Trail entirely, and alleged the easement plaintiffs sought would render their property “undevelopable” and “utterly useless.”
A court trial took place over eight days, at the outset of which the trial judge, counsel for both sides, Hadid, and two park rangers walked and drove the length of the trail from Franklin Canyon Park to the survey marker at the summit of the Peak Trail.
1. Plaintiffs’ Evidence
a. The Trails
Plaintiffs showed the area surrounding the Hastain and Peak Trails is unimproved and scenic, and has long been used by hikers and others. At trial, Brian Bradshaw, plaintiffs’ expert on aerial photography, testified aerial photos taken from 1960 to 1971 showed the trails to be well established. Bradshaw testified, “the main trail is the Hastain Trail which has also been referred to as a fire road.” Paul Edelman, who worked for MRCA, testified MRCA patrolled and maintained the resources inside Franklin Canyon Park, which he described as “world-class.” He characterized the Hastain Trail as one of the park’s main trails. Although the summit (with its survey marker) was on private land (and not on the park map), Edelman believed it was a key resource because it allowed for a longer hike to a higher elevation with a good view. MRCA’s rangers patrolled the trails, and MRCA felt obligated to protect the summit, which hikers had long visited. Edelman had been on all parts of the trails at various times, including in the fall of 1972, and remembered yellow posts at the Hastain Trail trailhead connected by a chain or cable to keep cars out. He thought the barrier had been installed by the fire department and indicated the trail was a public fire road. In 2011, he became aware that Hadid had fenced off the trail.
b. Hastain Trail Legacy Hikers
Plaintiffs identified the prescriptive time frame as March 1967 to March 1972, during which the Hastain Trail was used by seven legacy hikers who *1020 testified at trial: James Goller, Larry Harrow, Joan Carl, Frederic Harris, Carole Hemingway, Cynthia Foran, and Richard Saul.[2]
Goller testified he hiked the Hastain Trail on Sundays approximately 40 times per year from 1967 (and prior), when he was 10 years old, to 1972 (and beyond), at first with his father, then six times with his 12-member Cub Scout den, and later, as a teenager, with friends.
Harrow hiked the trail from approximately 1963 to recently. During the prescriptive period, he hiked the trail approximately every other weekend in 1967 and 1968, and from 1970 to 1972, sometimes with friends and sometimes by himself.
Carl, a sculptor, testified she hiked the trail with her dog in the mornings or late afternoons from October to April beginning in 1968. She would start from Coldwater Canyon Drive and hike southward, usually turning around after passing the peak, using the trail ‘“[s]ometimes twice a week, sometimes twice a month. Sometimes maybe not at all.” She eschewed hiking from May to September to avoid heat and rattlesnakes. Carl believed the trail was public property because it was “totally open,” with a garbage can for dog waste. Until shortly before trial she thought it was called the “Coldwater Trail.”
Harris and Hemingway hiked the trail together four or five times a week in the late afternoon or early evening during the summers of 1970 and 1971, plus an occasional Thanksgiving or Christmas holiday during those years.[3] Harris would park his car at the trailhead on Lake Drive (west of defendants’ property) and hike a circuit of the trail in two different directions. He testified the Hastain Trail “dumped out” on Coldwater Canyon Drive (north and east of defendants’ property). An average hike lasted from one to two hours.
Foran hiked the trail six or seven times in 1971, when she was 11 years old, half the time with an older brother and the other half with some friends.
Saul hiked the trail once in 1971, alone.
The legacy hikers saw others on the Hastain Trail. Goller testified he saw eight to 20 people over the course of each of his hikes. Harrow saw between two and 12 people on the trail every time he was on it. Carl occasionally saw *1021 others in one’s and two’s, sometimes in groups of two to four, including equestrians and dog walkers. Harris and Hemingway always saw six to 12 cars parked at the trailhead on Lake Drive, and between six and 20 people on the trail during their hikes. Foran would see one or two other hikers during each of her seven hikes. Saul saw no one else during his one time on the trail.
Plaintiffs estimated the trail took about two hours to hike. Assuming a hiking day is six hours long (because most people do not hike in the midday sun), plaintiffs calculated that approximately 12 people used the trail per day, which amounted to approximately 4,000 people per year.
c. Peak Trail Legacy Hikers
Only Goller, Harris, Hemingway and Foran testified they used the Peak Trail during the relevant time period. Goller used it approximately 40 Sundays a year from 1967 to 1972 (and before and after that time), Harris and Hemingway used the trail once or twice a week in the summers of 1970 and 1971, and Foran used it seven times in 1971.
Goller testified the Peak Trail was “really steep,” “very narrow,” “arduous,” and a “challenge.” Harris testified the trail was “pretty treacherous,” and Hemingway said it was “steep, had cliffs on both sides,” and Harris had to “push” her to climb it. Foran testified the Peak Trail could not be reached on a minibike because the embankment between it and the Hastain Trail was too steep.
No one testified to seeing anyone else specifically on the Peak Trail. Harris testified he saw people “all over the trail,” which could mean both the Hastain and Peak Trails, but the context indicates he meant the “trail” from Lake Drive to Coldwater Canyon, which is the Hastain Trail. He testified about the Peak Trail separately, and never said he saw anyone on it.
Only Harris testified to using either of the trails on any weekday, always accompanied by Hemingway.
d. Extrapolated Usage
Because the legacy hikers testified they almost always saw others on the Hastain Trail, from two to possibly a dozen or more each time, the trial court inferred many more must also have used both the Hastain and Peak Trails. “The average was about three to four other hikers,” the court found, which “[w]hen extrapolated over the hours of the day and days of the year [amounted] to thousands of hikers over the relevant period.”
*1022 2. Defendants’ Evidence
For the defense, Robert Pope, an expert on aerial photography, testified he had examined three-dimensional photographs depicting the Hastain Fire Road and its surrounding area beginning in the mid-1920’s, but found no definitive evidence the Peak Trail ever existed. He did not dispute, however, that a variety of people could have hiked to the peak between 1967 and 1972. Frank Haselton, a viewshed analysis expert, testified the Hastain Trail was visible from some public vantage points but not from others. Ken Shank, a surveying and grading expert who had prepared defendants’ building plans, testified homes could not be constructed on defendants’ lots if the requested public easement was established, but it might be possible to reroute the Hastain Trail to make room for the construction. He testified defendants’ building plans called for relocation of the Hastain Fire Road.
Hadid testified he had been a global real estate developer for 40 years. He first visited the subject property in 2001 or 2002 and was aware that a fire road passed through it but believed it could be relocated and rededicated. Before buying the property, Hadid inspected the land and performed a title check to discover if any easement or right-of-way existed, finding none. If there had been an easement or restriction, he would not have purchased the property.
3. Statement of Decision and Judgment
In October 2012, the trial court issued a tentative decision and judgment in favor of plaintiffs. Plaintiffs thereafter filed a proposed statement of decision, to which defendants objected on the grounds, among others, that it failed to address (1) “whether the court made an equitable balancing of the hardship on the Property Owners that would be imposed by granting the proposed implied easement on Defendants’ property” and (2) “whether the court is required to or even attempted to fashion the proposed easement as narrowly as possible to avoid prejudice to the [Defendants] with regards to the scope and location of the proposed easement on Defendants’ property relative to the Property Owner’s ability to develop his property as planned and to evaluate any hardship and/or balancing hardships between the parties.” In support of the objections, Shank, the surveying and grading expert, proposed that an alternative easement be created, one that allowed for residential development of the area while preserving the public’s hiking experience.
On April 17, 2013, the court overruled most of defendants’ objections and filed its judgment and amended statement of decision.
The judgment created an easement designated as the Hastain Trail but which we will call the “Judgment Trail” to distinguish it from the historical *1023 Hastain Trail. The Judgment Trail is set out in three segments. The first, tracking the Peak Trail, begins at the summit and proceeds southwestward for 233.72 feet, where it meets the Hastain Fire Road, and thence atop the fire road for 620.86 feet to the border between Coldwater Canyon’s and Lydda Lud’s parcels. The easement is described in metes and bounds, as follows: “COMMENCING AT THE NORTHWEST CORNER OF [LOT 1; defendants’ northernmost parcel], THENCE ALONG THE NORTHERLY LINE OF LOT 1, SOUTH 88°22’30 EAST, 674.66 FEET TO THE POINT OF BEGINNING, SAID POINT BEING THE CENTERLINE OF A 5.00 FOOT WIDE TRAIL, KNOWN AS THE HASTAIN TRAIL, THENCE ALONG THE HASTAIN TRAIL BEING 5.00 FEET WIDE AND LYING 2.50 FEET ON EACH SIDE OF THE FOLLOWING DESCRIBED CENTERLINE THE FOLLOWING COURSES:
“1st SOUTH 0.4°53’25” WEST, 16.24 FEET THENCE;
“2nd SOUTH 0.3°15’56” EAST, 19.22 FEET THENCE;
“3rd SOUTH 16°29’43” WEST, 71.72 FEET THENCE;
“4th SOUTH 20°21’13” WEST, 71.72 FEET THENCE;
“5th SOUTH 11°45’02” WEST, 54.82 FEET TO A POINT, SAID POINT HEREINAFTER REFERRED TO AS POINT ‘A’. SAID POINT BEING THE TERMINATION OF THE 5.00 FOOT WIDE TRAIL AND THE BEGINNING OF THE 15.00 FOOT WIDE TRAIL;
“THENCE, CONTINUING ALONG HASTAIN TRAIL BEING 15.00 FEET WIDE AND LYING 7.50 FEET ON EACH SIDE OF THE FOLLOWING DESCRIBED CENTERLINE THE FOLLOWING COURSES:
“6th SOUTH 1.5°46’35” WEST, 138.25 FEET THENCE;
“7th SOUTH 31°07’10” EAST, 99.68 FEET THENCE;
“8th SOUTH 38°04’10” WEST, 98.16 FEET THENCE;
“9th SOUTH 46°45’46” WEST, 92.28 FEET THENCE;
“10th SOUTH 49°09’09” WEST, 15.98 FEET THENCE;
“11th SOUTH 18°57’00” WEST, 15.45 FEET THENCE;
“12th SOUTH 08°44’01” EAST, 59.10 FEET THENCE;
*1024 “13th SOUTH 03°49’45” EAST, 95.96 FEET THENCE.”
The second segment begins at the border between Franklin Canyon Park and Lydda Lud’s southernmost parcel and proceeds 740.79 feet northeastward until it meets up with the first segment. This segment is described in metes and bounds also, for example as follows:
“COMMENCING AT THE NORTHWEST CORNER OF [LYDDA LUD’S LOT 6], THENCE SOUTH 00°16’16” WEST, A DISTANCE OF 278.89 FEET TO THE TRUE POINT OF BEGINNING;
“THENCE . . . ALONG SAID HASTAIN TRAIL BEING 15.00 FEET WIDE AND LYING 7.50 FEET ON EACH SIDE OF THE FOLLOWING DESCRIBED CENTERLINE THE FOLLOWING COURSES:
“1st SOUTH 70°00’33” EAST, 13.62 FEET THENCE;
“2nd NORTH 82°49’32” EAST, 40.82 FEET THENCE; [¶] . . . [¶]
“11th NORTH 40°19’01” EAST, 62.00 FEET TO A POINT THAT IS DISTANT SOUTH 79°51’34” EAST, 383.30 FEET FROM THE NORTHWEST CORNER OF [LYDDA LUD’S LOT 5].”
The third segment of the easement describes, also in metes and bounds, a 158.68 inverted “U” where a portion of the Hastain Fire Road departs from Franklin Canyon Park into Lydda Lud’s property but quickly returns to the park.
The judgment is silent as to that portion of the Hastain Trail running north from the junction with the Peak Trail to the Beverly Ridge community. The judgment is also silent as to those portions of the Hastain and Peak Trails that were either rededicated in or eliminated by the Beverly Ridge development.
In its statement of decision, the trial court found the Judgment Trail was “an old fire road leading from Lake Drive up the hill until very near the peak. At that point, the Trail veers east from the fire road up to the peak.” The “general public knew of and used the trail for five continuous years prior to March 4, 1972.” The public’s use was “substantial,” i.e., by more than a limited and definable number of persons. The court found “the public used the trail without objection and as if it were a public trail,” and no user was told he or she was on private property or warned not to hike the trail, and no fences or signs impeded hiking. The public use was open and obvious, and the then owners had either actual or constructive notice of it. Further, most of the hikers testified they saw other hikers throughout the length of the trail, *1025 from two to a dozen or more, and “a substantial number of the other hikers were hiking to the peak” during the relevant period. The court found that photographs and testimony demonstrated the public used the Hastain Fire Road to get to the Peak Trail, and used the Peak Trail to get to the summit. In 2011, grading had slightly modified the junction of the two trails, but the court found this modification too insubstantial to affect the easement. In sum, the court found defendants’ predecessors had impliedly dedicated an easement for ‘“public recreational uses of hiking, jogging, and dog-walking.” The easement is five feet wide on the Peak Trail portion and 15 feet wide on the Hastain Trail portion.
The judgment provides that defendants ‘“hold no legal or equitable right, title, estate, lien or interest in and to the Trail” and have no obligation to maintain it, and enjoins defendants from interfering with public recreational uses and reasonable maintenance of the trail and orders them to remove from it all items they own or control.
Regarding defendants’ objections, the court stated defendants’ inability to develop the property was ‘“irrelevant. When Defendants acquired the property, they took subject to whatever easements and encumbrances had been created by prior owners.” In response to the argument that the court should fashion the easement so as to avoid prejudice to defendants’ right to develop the property, the court stated that it ‘“fashioned nothing. The easement is as described in the surveys attached to the pleadings and stipulated at trial.” The court also refused to “ ‘balance the equities’ . . . because Defendants’ claim of hardship and balancing the equities is not an element of an implied dedication at law for public recreational purposes.” Moreover, the court stated, there was no ‘“hardship” to defendants because they ‘“acquired their property interests decades after the public had already [become] vested in its right to use the Trail.” Finally, the court stated that defendants ‘“are simply not in an equitable position,” because ‘“the due diligence [Hadid] performed on the property was inadequate and insufficient.” Hadid, the court explained, ignored evidence of the public’s use of the trail, and the testimony of his belief that all claims must be recorded was not credible.
4. Posttrial Motions
In motions for new trial and to vacate the judgment, defendants renewed their arguments that the court should consider the hardship to them and ‘“balance the equities in determining the scope or location of the [easement].” Defendants’ proposed an ‘“Alternative Trail Easement” that they represented provided ‘“panoramic views that are far superior to the view available at the top of the ‘Peak Trail’ portion of the [easement defined in the judgment] which has an impaired view looking north due to a fence built by the owner *1026 of the property to the north and his placement of tall trees along the fence line.” The Alternative Trail Easement would also connect to other trails managed by MRCA, and be safer and longer than the Judgment Trail. Hadid represented he would grade the Alternative Trail Easement and add a viewing deck and other related improvements for the benefit of the hiking public so as to make the Alternative Trail Easement a better hiking experience than that afforded by the Judgment Trail. Hadid stated he offered the plans so the court under its equitable powers could ‘“consider and balance the equities of an alternative location for placement of the public trail for hiking purposes and for entry of a new judgment.”
In their opposition to defendants’ motion to vacate the judgment, plaintiffs argued the court had previously addressed and rejected defendants’ arguments. They did not, however, dispute Hadid’s presentation about the benefits of the proposed Alternative Trail Easement.
In denying the motions for new trial and to vacate the judgment, the court rejected defendants’ arguments by referencing its statement of decision.
Defendants filed a timely appeal. The trial court thereafter granted Scott’s and Friends of the Hastain Trail’s motion for attorney fees, awarding $330,696.60. Defendants filed a timely appeal from the fee award as well. We consolidated the two appeals. After oral argument, we requested further briefing on issues discussed in this opinion, which both sides provided. Defendants submitted along with their letter brief requests for judicial notice of a title report, a 1936 deed, certain portions of the 2013 California Fire Code (Cal. Code Regs., tit. 24, pt. 9), a document published by the Los Angeles Fire Department, a publication issued by the United States government, and portions of the Los Angeles Municipal Code. Defendants’ requests for judicial notice are denied because the documents are either irrelevant, lack foundation, or attempt to introduce new evidence.
DISCUSSION
Defendants argue the trial court applied the wrong law; the judgment is unsupported by substantial evidence; the Judgment Trail is not the same as was used by the public during the prescriptive period; the trial court should have relocated the trail to serve equity; and the judgment improperly granted the public a fee interest in the easement.
I. The Trial Court Properly Applied Gion.
Defendants argue the doctrine of implied dedication set forth in Gion applies only to beachfront or shoreline property and roads, not to inland wilderness property or recreational hiking trails. We disagree.
*1027 A “dedication” is an uncompensated transfer of an interest in private property to the public, and “may occur pursuant to statute or the common law.” (Friends of the Trails v. Blasius (2000) 78 Cal.App.4th 810, 820 [93 Cal.Rptr.2d 193] (Blasius).) “ ‘Dedication has been defined as an appropriation of land for some public use, made by the fee owner, and accepted by the public. By virtue of this offer which the fee owner has made, he is precluded from reasserting an exclusive right over the land now used for public purposes. American courts have freely applied this common law doctrine, not only to streets, parks, squares, and commons, but to other places subject to public use. California has been no exception to the general approach of wide application of the doctrine.’ ” (Id. at p. 820.)
“Express dedication arises where the owner’s intent to dedicate is manifested in the overt acts of the owner, e.g., by execution of a deed. An implied dedication arises when the evidence supports an attribution of intent to dedicate without the presence of such acts,” such as “when the public use is adverse and exceeds the period for prescription.” (Blasius, supra, 78 Cal.App.4th at p. 821; see Union Transp. Co. v. Sacramento County (1954) 42 Cal.2d 235, 243 [267 P.2d 10], abrogated in part on other grounds by Sts. & Hy. Code, §§ 941, 1806 [intent on the part of the owner to dedicate land to the public may be shown expressly or by implication].) An owner’s offer to dedicate can thus be inferred from factual circumstances in the same general manner as prescriptive rights are established, i.e., circumstances that show “the public has used the land ‘for a period of more than five years with full knowledge of the owner, without asking or receiving permission to do so and without objection being made by anyone.’ [Citation.] . . . [T]he question is whether the public has engaged in ‘long-continued adverse use’ of the land sufficient to raise the ‘conclusive and undisputable presumption of knowledge and acquiescence, while at the same time it negatives the idea of a mere license.’ (Gion, supra, 2 Cal.3d at p. 38.)
“What must be shown is that persons used the property believing the public had a right to such use.” (Gion, supra, 2 Cal.3d at p. 39.) A litigant claiming implied dedication must establish “that persons have used the land as they would have used public land,” in the case of a beach or shoreline, “as if it were a public recreation area,” and if “a road is involved, the litigants must show that it was used as if it were a public road.” (Ibid.: see Bess v. County of Humboldt (1992) 3 Cal.App.4th 1544, 1550, 1551 [5 Cal.Rptr.2d 399].) The evidence must also demonstrate that “various groups of persons,” not a “limited and definable number of persons,” have used the land “ ‘when they wished to do so without asking permission and without protest from the land owners.’ ” (Gion, supra, at pp. 39, 40.) The “ ‘issue is ordinarily one of fact, giving consideration to all the circumstances and the inferences that may be drawn therefrom. The use may be such that the trier of fact is justified in inferring an adverse claim and user and imputing constructive knowledge *1028 thereof to the owner.’ ” (Id. at pp. 40-41, quoting O’Banion v. Borba (1948) 32 Cal.2d 145, 148-149 [195 P.2d 10].) Each inquiry depends on “ ‘the facts and circumstances attending the use.’ ” (County of Los Angeles v. Berk (1980) 26 Cal.3d 201, 214 [161 Cal.Rptr. 742, 605 P.2d 381], citations omitted (Berk); see Mulch v. Nagle (1921) 51 Cal.App. 559, 567 [197 P. 421] [“Whether a particular strip of land has been dedicated or abandoned to the public for highway purposes depends upon the circumstances of each case”].)
An owner may avoid dedication by affirmatively proving the public was granted a license to use the property. (Gion, supra, 2 Cal.3d at p. 41.) Even if the present fee owners make it clear that they do not approve of the public use of the property, “[previous owners ... by ignoring the wide-spread public use of the land for more than five years [may] have impliedly dedicated the property to the public.” (Id. at p. 44.) For example, in Gion, our Supreme Court concluded that an implied dedication of private land (three parcels of land on a shoreline, and a beach and the road leading to it) for public use occurred when the public had made use of the land for more than five years without objection by the owners. (Ibid.)
The Gion decision resulted in “soaring sales of chain link fences,” a “spate” of critical legal commentary, and the Legislature’s enactment of Civil Code section 1009. (County of Orange v. Chandler-Sherman Corp. (1976) 54 Cal.App.3d 561, 564 [126 Cal.Rptr. 765]; see 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 249, p. 303.) The statute, enacted on March 4, 1972, provides that “no use of [private real property] by the public after the effective date of this section shall ever ripen to confer upon the public ... a vested right to continue to make such use permanently” without an express dedication by the owner. (Civ. Code, § 1009, subd. (b); see Blasius, supra, 78 Cal.App.4th at p. 823.) Civil Code section 1009 abrogated the Gion decision, but only prospectively, affecting no rights that had vested prior to its enactment. (Blasius, at p. 823.)
Defendants argue Gion does not apply here because their property consists of inland wildlands, not beachfront or shoreline property or a road. In Gion, however, the court explained no different rules exist for roadways or other areas, noting that prior cases had found implied dedication in parkland, beaches and athletic fields. (Gion, supra, 2 Cal.3d at pp. 41-42.)
Defendants argue we should follow Richmond Ramblers Motorcycle Club v. Western Title Guaranty Co. (1975) 47 Cal.App.3d 747 [121 Cal.Rptr. 308], in which the majority stated in dicta that the rules and rationale of Gion apply only to roads, beaches, and shoreline areas, not remote wilderness areas. (Id. at pp. 754, 758-759.) But the Supreme Court later disavowed such a limitation in Berk, reiterating Gion s holding that the doctrine of implied *1029 public dedication is not limited to any specific kind of real property. (Berk, supra, 26 Cal.3d at pp. 214-215; see Burch v. Gombos (2000) 82 Cal.App.4th 352, 355, 356-358 [98 Cal.Rptr.2d 119] [upholding a finding of implied public dedication of a onefiane dirt road in the Santa Cruz Mountains]; Blasius, supra, 78 Cal.App.4th at pp. 822, 824 [“there is no difference between dedication of shoreline property and other property”; “Well within the ancient reach of the common law of dedication is the establishment of a public footway”]; County of Orange v. Chandler-Sherman Corp., supra, 54 Cal.App.3d at p. 564 [Gion applies to noncoastal property “such as roads, passageways and paths”].)
We conclude the trial court correctly applied Gion to plaintiffs’ implied dedication claim. Although it “may require more circumstances to establish” dedication in the case of uncultivated and unenclosed land, “the test is ultimately the same.” (O’Banion v. Borba, supra, 32 Cal.2d at p. 150; see Union Transp. Co. v. Sacramento County, supra, 42 Cal.2d at pp. 240-241 [“Whether the user was adverse is a question of fact to be determined from all of the circumstances of a case”]; Hays v. Vanek (1989) 217 Cal.App.3d 271, 282 [266 Cal.Rptr. 856] [“Whether an owner has made an offer is a question of fact requiring an examination of all the pertinent circumstances”].)
II. No Substantial Evidence Supports the Implied Dedication of a Public Trail Easement.
Having concluded the trial court applied the proper legal test, we must determine whether substantial evidence supports the finding of an implied-in-law dedication. In doing so, we accept as true all evidence tending to establish the correctness of the trial court’s findings, take into account all reasonable inferences that could lead to the same conclusion, and resolve every substantial conflict in the evidence in favor of the findings. (Ermoian v. Desert Hospital (2007) 152 Cal.App.4th 475, 501 [61 Cal.Rptr.3d 754].)
There is little if any evidence in the record about who owned the subject property during the prescriptive period or whether the owners actually knew hikers were using their land. The issue is therefore whether, under all the circumstances, public use of the subject property between 1967 and 1972 sufficed to put defendants’ predecessors on constructive notice that their property was in danger of public dedication. Plaintiffs must show the public “used the land as they would have used public land,” and in the case of a road, “as if it were a public road.” (Gion, supra, 2 Cal.3d at p. 39.)
A. Use of a Fire Road Easement Does Not Constitute Use of, or Grant Prescriptive Rights to, the Servient Tenement
Use sufficient for implied public dedication must “clearly indicate to the owner that his property is in danger of being dedicated.” (County of *1030 Orange v. Chandler-Sherman Corp., supra, 54 Cal.App.3d at p. 565.) No public use of the Hastain Fire Road could have put defendants’ predecessors on actual or constructive notice that their property was in danger of public dedication because the fire road was not their property, it was a public easement on their property, and once granted, the scope of a public easement cannot be materially changed without notice. (Civ. Code, § 806 [“The extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired”].)
The Public Resources Code instructs the State Board of Forestry and Fire Protection to adopt regulations implementing minimum fire safety standards applicable to lands for which the state bears responsibility, including regulations pertaining to fire roads. (Pub. Resources Code, §§ 4002, 4290.) The purpose of a fire road is to “provide for safe access for emergency wildland fire equipment and civilian evacuation concurrently, and . . . provide unobstructed traffic circulation during a wildfire emergency.” (Cal. Code Regs., tit. 14, § 1273.00.) The Los Angeles Municipal Code authorizes the Los Angeles Fire Chief to enforce fire regulations adopted by the state. (L.A. Mun. Code, § 57.103.1.4.) For example, Los Angeles Municipal Code section 57.4908.3 authorizes the fire chief “to construct fire roads and firebreaks in or upon any undeveloped lands in any mountain or hill area, whether or not such lands are public or private, with the consent of the owner thereof, and to maintain the same on a permanent basis when the Chief determines that such fire roads and firebreak are necessary for the protection of life and property against fire or panic.” Where such fire roads exist, they are “granted to the City without cost as easements from a public street or alley to the required terminal point.” (Id., § 57.503.1.6, italics added.) The fire department has the right to pass over fire roads by easement, license, city ownership, “or otherwise.” (Id., § 57.4908.3.1.) The right of an agency to use a fire road is a “reserved easement.” (Walsh v. Macaire (1951) 102 Cal.App.2d 435, 436 [227 P.2d 517].) A fire road may also become a public easement by the implied dedication process. (See, e.g., Brumbaugh v. County of Imperial (1982) 134 Cal.App.3d 556, 563 [184 Cal.Rptr. 11].)
A wilderness fire road is thus a conditional, temporary public easement, existing only for so long as and to the extent needed to help protect against fire. (See Jones v. Deeter (1984) 152 Cal.App.3d 798, 802 [199 Cal.Rptr. 825] [“A dedication is legally equivalent to the granting of an easement”]; Walsh v. Macaire, supra, 102 Cal.App.2d at p. 436.) When land burdened by a fire road easement is developed, the road is replaced with an approved fire apparatus access road extending to within 150 feet of all portions of the exterior walls of the first story of every building. (See L.A. Mun. Code, § 57.503, adopting the Internat. Fire Code, § 503.1.1; see also Cal. Code Regs., tit. 24, § 503.1.1 [California Fire Code].) These access roads are commonly public and private streets.
*1031 An easement is an interest in the land of another that entitles the owner of the easement to limited use or enjoyment of the servient tenement. (City of Long Beach v. Daugherty (1977) 75 Cal.App.3d 972, 977 [142 Cal.Rptr. 593].) The circumstances existing at the time of and giving rise to the conveyance determine the nature and extent of the easement. (Civ. Code, § 806; Southern Pacific Co. v. San Francisco (1964) 62 Cal.2d 50, 54 [41 Cal.Rptr. 79, 396 P.2d 383]; Burch v. Gombos, supra, 82 Cal.App.4th at p. 362.) The use may change or increase, but only so long as the change does not materially increase the burden on the servient tenement. (Rye v. Tahoe Truckee Sierra Disposal Co., Inc. (2013) 222 Cal.App.4th 84, 92 [170 Cal.Rptr.3d 275].) Any permissible change would be limited “to such uses as the facts and circumstances show were within the reasonable contemplation of the parties at the time of the conveyance.” (Fristoe v. Drapeau (1950) 35 Cal.2d 5, 10 [215 P.2d 729]; see Camp Meeker Water System, Inc. v. Public Utilities Com. (1990) 51 Cal.3d 845, 866-867 [274 Cal.Rptr. 678, 799 P.2d 758].)
Here, it was undisputed the Hastain Trail ran atop the Hastain Fire Road. Maps from the 1920’s to the present showed and labeled the fire road, lawyers from both sides described it as a fire road during the site visit, experts from both sides stated the trail ran atop the fire road, several hikers identified it as a “road,” and the judgment itself refers to it as a fire road and states the “Fire Road is that portion of the survey, attached as Exhibits A and B, of the Trail which is 15 feet wide,” which includes all of the Hastain Trail.
At the time the Hastain Fire Road was created the property owners and public could reasonably contemplate it would be used by hikers and, as such would not materially increase the burden on the servient tenement. “Road easements can be used for all reasonable purposes.” (6 Miller & Starr, Cal. Real Estate (4th ed. 2015) § 15:59, p. 15-212.) But the parties could not reasonably contemplate the hikers’ use would become permanent, because transforming a temporary, mutable easement into one that is permanent and immovable would substantially increase the burden on the servient tenement by restricting its future development. In “ascertaining whether a particular use is permissible under an easement created by prescription, the needs which result from a normal evolution in the use of the dominant tenement and the extent to which the satisfaction of those needs increases the burden on the servient tenement must be considered. The increase must be a normal development, reasonably foretold, and consistent with the pattern formed by the adverse use by which the prescriptive easement was created.” (Applegate v. Ota (1983) 146 Cal.App.3d 702, 711 [194 Cal.Rptr. 331].) Permissible use by the public of an easement the public already owns would not foretell a drastically expanded use, inconsistent with the pattern under which the easement was created, much less that the servient tenement would itself be in danger of permanent, unconditional public dedication, as occurred here.
*1032 The trial court implicitly recognized these principles, finding that ‘“[w]hen Defendants acquired the property, they took subject to whatever easements and encumbrances had been created by prior owners. . . . [T]he public easement must be respected.” But the court failed to recognize that the same was true as to the public itself, which likewise took the fire road subject to the preexisting easement.
‘“If a landowner’s intent to dedicate property to public use is to be implied, that purpose must clearly appear from the surrounding circumstances. [Citations.] The rationale underlying the strict requirements which must be satisfied to establish a dedication is to avoid potential detriment to persons who, through inattention to legal detail or motivated by decency permit others to use their land.” (Hays v. Vanek, supra, 217 Cal.App.3d at pp. 281-282.) The ‘“idea of a dedication to the public of a use of land for a public road, must rest on the clear assent of the owner, in some way, to such dedication.” (Harding & Loftin v. Jasper (1860) 14 Cal. 642, 649.) The ‘“bare fact that a farmer opens a lane through his farm, and allows the public to use it for fifteen years, does not authorize the inference of a dedication to the public. The intent to dedicate must be obvious. . . . ‘Persons who have, from mere kindness, suffered others to enjoy privileges in their lands, have been eventually coerced into parting with them entirely, without compensation, and to yield up as rights what they had previously suffered or allowed as favors, and the simple expression of an intention, has often been distorted into a positive promise, and occasionally to those who have no distinct interest in its performance. Our title to our lands is too important to be lightly lost, upon slight presumptions. Before the owner should be deprived of his property, his intention to part with it should be clearly and unequivocally expressed.’ ” (Id. at pp. 648-649, citation omitted.)
The trial court erred in establishing a permanent and fixed public easement that drastically expanded on the existing temporary and mutable public easement. The judgment gave the public rights not only to use the fire road for so long as its existence was necessary for fire protection, but also to burden the underlying fee estate in perpetuity, as set forth in the metes and bounds description of the new easement. Those rights were neither conditional nor temporary, as was the fire road easement itself, but unlimited and permanent. But “ ‘[n]othing can be clearer than that if the grant is made for a specified, limited and defined purpose, the subject of the grant cannot be used for another, and the grantor retains still such an interest therein as entitles him, in a court of equity, to insist upon the execution of the trust as originally declared and accepted.’ ” (Marshall v. Standard Oil Co. (1936) 17 Cal.App.2d 19, 27 [61 P.2d 520].) It is a “ ‘universally accepted rule of law that land which has been dedicated for a definite and specific purpose must be used in conformity with the terms of the dedication, and not diverted to any other purpose or use.’ ” (Ibid.; see Roberts v. Palos Verdes Estates (1949) 93 *1033 Cal.App.2d 545, 547 [209 P.2d 7] [“where a grant deed is for a specified, limited and definite purpose, the subject of the grant cannot be used for another and different purpose”].)
Blasius, upon which plaintiffs chiefly rely and the facts of which are somewhat analogous to those here, is not to the contrary. There, the public had for many years used a canal road alongside the Rattlesnake Canal— which together (road and canal) comprised an easement owned by the Nevada Irrigation District over property owned by private landowners—for walking, jogging, riding bicycles or horses, and fishing, as well as a means to get from one place to another. Based on this use, the trial court recognized the landowners had impliedly dedicated to the public an easement consisting of “ ‘the width of the Rattlesnake Canal plus its westerly berm, which is nine feet wide, more or less.’ ” (Blasius, supra, 78 Cal.App.4th at p. 819.) The appellate court affirmed the finding. In dicta the court also stated that “a long history of continued passage by a diverse group of occasional hikers across a well defined privately owned trail segment leading to a network of trails, say on a public wilderness area, might suffice” for implied public dedication. (Id. at p. 826, fn. 7.)
The instant facts are distinguishable from those both existing and hypothesized in Blasius. There, the trial court identified a dedicated trail easement in relation to the preexisting public easement it overlapped, the Rattlesnake Canal, not, as here, in a metes and bounds legal description of the subservient tenement. As such, the overlapping easement in Blasius was bound to the underlying easement, and if the latter were to change course or disappear altogether, the former would follow. Here, as plaintiffs admitted in their letter brief, the Judgment Trail is independent of and would survive relocation or removal of the Hastain Fire Road. It may well be, as the Blasius court stated in dictum, that continued passage by a diverse group of occasional hikers across a well-defined privately owned trail segment will suffice for public dedication of the trail segment, but passage across a contingent and temporary road does not suffice for permanent dedication of the privately owned subservient tenement.
Plaintiffs argue no evidence was adduced at trial that the fire department had an actual easement, license, or any right at all to use the Hastain Fire Road.
To the contrary, the only reasonable inference from maps admitted at trial, multiple witness statements, plaintiffs’ repeated admissions, and the judgment itself—all indicating the Hastain Trail was indeed a fire road—was that the fire department at least had a right to use it, if not an easement or license. In any event the point is irrelevant, as we do not hold that a preexisting fire *1034 road—whether an easement or not—cannot be publicly dedicated so long as the dedication is limited to the fire road. But here, the trial court found the servient tenement, not the fire road, was dedicated to the public. As we discussed, nothing about public use of a fire road as a hiking trail would put a reasonable owner on notice that the servient tenement was in danger of dedication.
Plaintiffs have identified no authority from any jurisdiction holding that use of a fire road (or anything similar) by a private party or the public may result in either a prescriptive easement or public dedication burdening the servient tenement and outlasting the road itself, and we have discovered none.[4] Some of the cases hold an owner cannot restrict use of a dedicated road running over his property, but none holds the owner cannot remove the road altogether. In the case of a fire road, an owner can remove it when it is no longer needed for fire protection. Under these circumstances, no reasonable owner could anticipate that a fire road running over his or her property might become a permanent hiking trail.
The judgment here grants permanent rights to the servient tenement, land burdened by a preexisting, conditional, temporary public easement, notwithstanding temporal limitations on the easement itself. No such rights could have ripened by way of public dedication no matter how extensive the public use of the Hastain Fire Road because the owner could not have known more than the temporary road itself was at risk.
B. No Substantial Use of the Peak Trail
The same cannot be said of the Peak Trail, because the fire road beneath it had been abandoned by the 1940’s, and any public rights to it were therefore extinguished long before the prescriptive period. (Civ. Code, § 811, subd. 4 [a *1035 servitude is extinguished by disuse].) But under even the most generous view of the evidence, public use of the Peak Trail was miniscule.
Under Gion, a plaintiff asserting implied public dedication must present evidence that “the public has engaged in ‘long-continued adverse use’ ” that “ ‘negatives the idea of a mere license’ ” or neighborly accommodation. (Gion, supra, 2 Cal.3d at p. 38; see Blasius, supra, 78 Cal.App.4th at p. 825 [the question is “whether the use in issue should be characterized as prescriptive or attributed to neighborly accommodation”]; Aptos Seascape Corp. v. County of Santa Cruz (1982) 138 Cal.App.3d 484, 501 [188 Cal.Rptr. 191].)[5] To counter the idea of license a plaintiff must show open, substantial use of private property. (Gion, at p. 39.) In Gion, which found a public dedication, members of the public had for decades “made continuous and uninterrupted use” of beachfront property “in substantial numbers,” with full knowledge of the owners, for fishing, swimming, picnicking, and viewing the ocean. (Id. at pp. 34, 35, 36.)
Here, the trial court’s finding that “[s]everal of the legacy hikers hiked the Trail during each of the years from 1962 to 1972” is unsupported in the record. The only legacy hiker to have used either the Hastain or Peak Trail every pertinent year—1967 to 1972—was Goller, who used the trails only on Sundays, beginning when he was 10 years old and continuing until he was approximately 15. Further, the trial court’s findings that “[m]ost of the legacy hikers regularly hiked from the bottom of the Trail at Lake Drive all the way to the peak,” that “the peak, with its survey marker, is the logical and obvious destination for any hiker on the Trail,” and that “a substantial number of the other hikers were hiking to the peak too” are all unsupported. Of the seven legacy hikers who used the trails in the relevant time period, only four testified they ever hiked to the peak, and only one, Goller, testified he did so regularly (on Sundays). Harris and Hemingway, who hiked the Hastain Trail four to five times a week in the summers of 1970 and 1971, hiked to the peak only once or twice a week in those two summers. Foran went to the peak a *1036 total of six or seven times in 1971. The trial court’s finding that “most of the hikers” saw other hikers “throughout the length of the trail” is also unsupported. None of the legacy hikers testified he or she ever saw anyone else on the Peak Trail. Five of the six legacy hikers who saw others testified only that they saw them on “the trail,” which in context meant the Hastain Trail, not the Peak Trail. Only Harris testified he saw people “all over the trail,” which could be taken to mean also on the Peak Trail, but in context he was speaking of the trail from Lake Boulevard to Coldwater Canyon, which is the Hastain Trail. Harris testified about the Peak Trail separately, and did not say he ever saw anyone else on it.
Thus in 1967, 1968, 1969 and 1972, and most of 1970 and 1971, the only legacy hiker on the Peak Trail was Goller, who hiked only on Sundays. The trial court could not fairly infer solely from his example that others used the Peak Trail any other day.[6]
Even were we to assume Goller, Harris, Hemingway and Foran saw others on the Peak Trail, their own use was so sparse—Sundays for Goller, one or two days a week during two summers for Harris and Hemingway, and six or seven trips in 1971 for Foran—that their experience does not reasonably imply a substantial number of other hikers used the trail at other times or on other days. Therefore, no reasonable owner could have been put on notice that the Peak Trail was in danger of public dedication. The court found additional evidence of substantial use of the Peak Trail from the fact it had not become overgrown, which it would if unused. But no evidence suggested how much or what kind of use was necessary to prevent the trail from becoming overgrown. For all we know, the Sunday use by Goller and his friends would have sufficed. The issue is not whether the trail was used enough to retain its character as a trail, but whether the use was substantial enough to indicate to the owner that his property was in danger of being dedicated.
*1037 III. Defendants’ Other Arguments
In light of our conclusion that the Judgment Trail was improperly dedicated, we need not address defendants’ arguments concerning the scope of the trail, the equihes involved in relocating it, or the extent of the interest dedicated.
IV. Attorney Fees
Defendants appealed from the order awarding attorney fees to Scott and the Friends of the Hastain Trail. Because the judgment is reversed, the award of fees is also reversed. (Samples v. Brown (2007) 146 Cal.App.4th 787, 811 [53 Cal.Rptr.3d 216].)
DISPOSITION
The judgment and attorney fee award are reversed. The trial court is ordered to enter a new judgment in favor of defendants consistent with this opinion. Costs on appeal are awarded to defendants and appellants.
Rothschild, P. J., concurred.

 As will be discussed, post, the prescriptive period runs from March 1967 to March 1972.

 An eighth legacy hiker, Keith Lehrer, testified he used the Hastain Trail with his friend and the friend’s father about 15 times in 1965, which the trial court found to be before the relevant time period. He sometimes went to the peak. He always saw four to six other people on the trail.

 Hams and Hemingway also hiked the trail in the summer of 1972, which is after the relevant time period.

 Burch v. Gombos. upon which the dissent relies, is not dispositive. There, property owners sued a logging company to enjoin use of a fire road running across their' property for transporting logs. (Burch v. Gombos. supra. 82 Cal.App.4th at p. 355.) The trial court found the road had been impliedly dedicated to the public as a result of longtime public recreational use, and further found the owners could not restrict the logging company’s use of what now amounted to a public road. (Id. at p. 363.) Although the appellate court affirmed these findings, the property owners on appeal made “no real argument” regarding the prior public dedication, but argued only that the evidence did not support expansion of the dedication to logging purposes. (Id. at p. 362, fn. 14.) The court therefore had no occasion to discuss whether public recreational use of a fire road suffices to convey notice to the owner that even the road is in danger of public dedication, much less, as here, that the subservient tenement is. A case is no authority for a proposition not discussed. (People v. Barragan (2004) 32 Cal.4th 236, 243 [9 Cal.Rptr.3d 76, 83 P.3d 480].)

 The “idea of license” is the idea that owners of wildlands might permit occasional hikers to enter their' property with no thought on either side that sparse, harmless use will ripen into prescriptive rights or public dedication. (See Boyden v. Achenbach (1878) 79 N.C. 539, 541 [footpaths “are understood to be used by leave, and they are closed when the owners of the lands desire to put them under cultivation or to enclose them”]; Behrens v. Richards (1905) 2 Ch. 614 at 620 (Eng.) [“In permitting persons to stray along the cliff edge or wander down the cliff face or stroll along the foreshore the owner of the land was permitting that which was no injury to him and whose refusal would have been a churlish and unreasonable act on his part. From such user nothing ... is to be inferred”]; Schwinge v. Dowell (1862) 175 Eng.Rep. 1314 [permission to travel at will in an ancient forest does not show a right to the foothpath]; Natural England The Countryside Code [“Leave gates and property as you find them and follow paths unless wider access is available”].) This is not a presumption, but a burden of proof. (See Berk, supra. 26 Cal.3d at p. 215 [cases are “to be decided not from the standpoint of presumptions but from that of ‘the sufficiency of the evidence’ ”].)

 For a statistical inference from a sample (the legacy hikers) to a population (a substantial number of hikers) to be justified, the “sample must be sufficiently large to provide reliable information about the larger group. ‘How many cases need to be sampled? This depends in large part on the variability of the population. The more diverse the population, the larger the sample must be in order to reflect the population accurately.’ ” (Duran v. U.S. Bank National Assn. (2014) 59 Cal.4th 1, 42 [172 Cal.Rptr.3d 371, 325 P.3d 916].) “Sampling is a methodology based on inferential statistics and probability theory. ‘The essence of the science of inferential statistics is that one may confidently draw inferences about the whole from a representative sample of the whole.’ [Citation.] Whether such inferences are supportable, however, depends on how representative the sample is. ‘[I]nferences from the part to the whole are justified [only] when the sample is representative.’ ” (Id. atp. 38.) Here, Goller is a sample of one.